Fathalla EL–MESWARI, personal representative of the Estate of Iman El-Meswari, a minor, Hawa Habil El-Meswari, Appellants,

v.

WASHINGTON GAS LIGHT COMPANY, Davenport Insulation, Inc., Valley Roofing, Inc., West Briar, Inc., Mark Mitchell, Dwight Showalter, Appellees.

Fathalla EL–MESWARI, personal representative of the Estate of Iman El-Meswari, a minor, Hawa Habil El-Meswari, Appellants,

v.

Frank CLOWER and F.M. Clower, Inc., Appellees.

Nos. 84–2297(L), 84–2386.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1985.

Decided March 4, 1986.

Rehearing Denied April 2, 1986.

Michael E. Geltner (James G. Abourezk, Mowahid H. Shah, Abourezk, Sobol & Trister, Washington, D.C., on brief), for appellants.

Thomas F. Farrell, II, Richmond, Va., (Grady C. Frank, Jr., Boothe, Prichard & Dudley, McLean, Va., on brief), Edward H. Grove, III (Brault, Geschickter, Palmer & Grove, Manassas, Va., Thomas M. Wochok, Richard A. Yeagley, Richard H. Lewis, Lewis & Trichilo, Robert L. Ellis, Siciliano, Ellis, Sheridan & Dyer, Fairfax, Va., William J. Carter, Edward J. Walinsky, Carr, Goodson & Lee, Washington, D.C., William O. Snead, Cremins, Snead & Annunziata, Fairfax, Va., on brief), for appellees.

Before WINTER, Chief Judge, WILKINSON, Circuit Judge and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

WILKINSON, Circuit Judge:

Five-year old Iman El-Meswari was struck and killed by materials thrown by workmen from a building roof. The family sued those responsible under Virginia's wrongful death act. The trial court ruled that that law offered assistance for some aspects of the family's condition but that the state would not recognize or respond to other burdens. We now review these several decisions and affirm the judgment of the district court in all but one respect.

We consider the various elements of recovery in turn. We begin with the economic burdens suffered by the El-Meswari family and next address the emotional burdens of the survivors and their attempt to assess punitive damages for Iman's death on those responsible. Turning then from the survivors' burdens, we discuss the limits of recovery for Iman's own pain and suffering in the short period before her death. Finally, we assess which parties should be responsible in whatever recovery the law affords.

I

In April 1982, West Briar, Inc. purchased an apartment complex in Alexandria, Virginia, in order to remodel and re-market the apartments as condominiums. To coordinate the conversion construction, West Briar hired general contractor F.M. Clower, Inc. Clower awarded the West Briar roof resurfacing work in April 1983 to Davenport Insulation, Inc., a subsidiary of Washington Gas Light Company. Davenport, unable to perform the job with its own employees, agreed to pay Valley Roof-

ing, Inc. to supply laborers for the project. Resurfacing work began on May 9, 1983.

By the late afternoon of May 26, 1983, the West Briar roofs were ready, and workers began to remove the Davenport tools and roofing materials from the last building. After lowering torches, gas tanks, and trash cans with a rope, Valley employees Dwight Showalter and Walter Zimmerman asked Davenport representative Mark Mitchell what they were to do with the five remaining rolls of roof covering. Mitchell, who was on the ground below Showalter and Zimmerman, told them to drop the materials to him.

The men on the roof protested that the Valley Roofing president had ordered them not to throw anything over, but Mitchell insisted. Zimmerman asked Mitchell to take responsibility for the rule violation and to watch for nearby children. A few moments later, on Mitchell's signal, Showalter threw an eighty-eight pound roll of roofing material down three stories onto the asphalt. Zimmerman followed with another, and Mitchell placed the rolls in a Davenport trailer as they fell. An ice cream truck then approached the building, visible to Showalter and audible to Mitchell; but Showalter, seeing no bystanders from the roof and hearing no warning from Mitchell, pushed another load over the edge. The material crashed onto five-year-old Iman El-Meswari, a West Briar apartment resident who had at the arrival of the ice cream truck run toward her apartment, around the building corner, and in front of Mitchell. Iman died on June 3, 1983.

Iman's father and personal representative Fathalla El-Meswari filed suit against Mitchell, Showalter, Davenport Insulation, Valley Roofing, West Briar, Clower, and Washington Gas Light Company. The first two counts of the complaint, brought under the Virginia wrongful death statute, sought reimbursement for Iman's medical and funeral expenses, compensation for the companionship and income that she would have provided to the family, and punitive damages from the parties responsible for her death. The third count of the complaint, brought under the Virginia statute governing the survival of tort actions, sought reparation for Iman's pain and suffering. In addition to these three prayers for relief, the complaint also included a fourth count, the independent petition of Iman's mother Hawa Habil El-Meswari to recover for the emotional distress that she had endured as a witness to her daughter's injuries.

Prior to trial, the district court dismissed Mr. El-Meswari's claim for Iman's pain and Mrs. El-Meswari's claim for her own distress, ruling that Virginia law would not recognize suits based on either of those grievances. Also before trial, the court awarded full summary judgment to defendant Clower and approved a settlement agreement that had been reached between Fathalla El-Meswari and defendant Washington Gas Light Company. At trial, upon the conclusion of the plaintiff's evidence, the court entered a directed verdict for defendant West Briar on all counts and a directed verdict for all defendants on the punitive damages count. After next directing a verdict of liability against Mitchell, Showalter, Davenport Insulation, and Valley Roofing, the court permitted the jury to determine an amount that Iman's representative should receive for hospital payments and for the loss of Iman's society and income. The jury returned a verdict for $45,759.90 in medical expenses and $75,000 in other damages. To this recovery the district court on a motion after trial added $2,500 for funeral expenses. Alleging error in several of these pre-trial, trial, and post-trial decisions, Mr. and Mrs. El-Meswari now appeal.

## II

Of the many different losses that the El-Meswari family suffered in the death of Iman, the money spent for medical treatment and burial is perhaps the dimension in which the law is most competent to respond. In order to realize fully at least this limited potential, Va.Code § 8.01–52(3) authorizes recovery for care of the accident victim and § 8.01–52(4) authorizes recovery

for "reasonable funeral expenses." Iman's representative raises no question on appeal with respect to the award of $45,790.90 toward hospital charges, but argues that the district court erred in allowing only $2,500 for the funeral when the cost of burying Iman in her home country of Libya was over $20,000. As we agree that the trial court improperly constricted the relief that the law offers to the El-Meswaris, we vacate the judgment on this point and remand the case for renewed proceedings.

The district court read the statutory guarantee of "reasonable funeral expenses" to exclude recovery for the foreign burial of a foreign citizen on the premise that a tortfeasor could not foresee that the death of his victim would present such substantial transportation costs. Virginia law, however, adopts the perspective of the victim rather than that of the defendant in this sort of situation. "The function of compensatory damages," according to *F.B.C. Stores, Inc. v. Duncan*, 214 Va. 246, 198 S.E.2d 595, 599 (1973), "is to make the plaintiff whole." To fulfill that function, the fact-finder must consider the circumstances of the injured party, not the circumstances of and effect upon a foreseeable party. This approach is more familiar, though no different, where unforeseeable damages are connected with an unusual physical condition rather than an unlikely national origin. In that setting, the Virginia Supreme Court has noted that, "It is a general rule that one who negligently inflicts a personal injury on another is responsible for all the ill effects which, considering the condition of health in which the plaintiff was when he received the injury, naturally and necessarily follow such injury." *Watford v. Morse*, 202 Va. 605, 118 S.E.2d 681, 683 (1961).

Although the Virginia Supreme Court has not yet interpreted § 8.01–52(4), we believe that the court would read "reasonable funeral expenses" in the sense suggested by its general rule of damages.

The court has ruled in another context that "in determining the reasonableness of funeral expenses, each case must rest on its own particular facts and circumstances." *Scott Funeral Home, Inc. v. First National Bank of Danville*, 211 Va. 128, 176 S.E.2d 335, 337 (1970) (relying on individual circumstances of decedent to calculate burial costs to be charged against estate). And another state court has ruled in the present context that its wrongful death statute permits recovery for the journey home. *Clancy v. Hawkins*, 53 Wash.2d 810, 337 P.2d 714 (1959); *see contra Ware v. Cia de Navegacion Andes, S.A.*, 180 F.Supp. 939, 945 (E.D.Va.1960) (recovery not allowed under Shipowners' Liability Convention of 1936 for transport from Virginia to Italy). Contract law, too, has recognized that funeral expenses cannot be deemed reasonable or unreasonable without some reference to the identity of the deceased. *See* Annot., *What Are Necessary Funeral Expenses Within Coverage of Medical Payment and Funeral Expense Provision of Insurance Policy*, 87 A.L.R.3rd 494 (1978).

Because the district court simply awarded $2,500 to the El-Meswaris as the cost of a standard local burial, the record does not reveal whether the plaintiffs' submitted expenses were reasonable for Iman's burial. This question may be resolved by agreement of the parties or by decision of the district court upon remand.

### III

Reaching beyond the El-Meswaris' hospital expenses, funeral expenses, and other economic burdens,[*] the Virginia wrongful death statute acknowledges the family's emotional burden in § 8.01–52(1), which offers the survivors a recovery for "sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent." The jury returned a verdict for $75,000 in these damages, from which it

---

[*] In addition to the reimbursement for expenses under § 8.01–52(3) and § 8.01–52(4), Va.Code § 8.01–52(2) authorizes "compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent." These elements of recovery are not at issue here.

awarded $30,000 each to Iman's mother and father and $5,000 each to Iman's sister and her two brothers.

Iman's mother now raises two objections to this estimate of her experience. First, she argues that the district court wrongly excluded evidence of serious physical disabilities suffered as a result of Iman's death. Second, she argues that her entitlement under § 8.01–52(1) to damages for her loss of Iman should be supplemented by a separate entitlement to damages for the trauma that she endured in seeing and hearing her injured daughter. Finding that the district court properly excluded the additional evidence and properly dismissed the additional claim, we make no adjustment in this aspect of the judgment.

### A.

In trying the claim for damages under the wrongful death statute, Iman's representative sought to show the overtly physical and the more elusive emotional dimensions of Mrs. El-Meswari's reaction to the death of Iman. To describe the emotional aspects, the plaintiff advanced Dr. Ayub K. Ommaya as an expert witness who had observed Mrs. El-Meswari's response to her loss. The district court, concluding that the jury could assess the mother's inner grief without expert guidance, excluded Dr. Ommaya's testimony on that point. This decision represented a reasonable exercise of the trial judge's broad discretion under Federal Rule of Evidence 702 to determine that a proposed expert will not significantly assist the arbiter of fact. *See Weinstein's Evidence* ¶ 702[02].

To describe the physical effects on Mrs. El-Meswari of Iman's death, the plaintiff offered to show that the incident had damaged Mrs. El-Meswari's heart and had caused her to suffer a miscarriage. As the district court held, § 8.01–52(1) does not authorize recovery for these injuries. The legislation addresses Iman's death as an independent event in Mrs. El-Meswari's life and attempts to compensate the mother for the disruption of that single relationship. It claims no competence to trace or to relieve the indirect, although no doubt powerful, influence of Iman's death as it touches all of Mrs. El-Meswari's future life. This statutory restriction is indicated in the examples of "sorrow, mental anguish, and solace" that are listed at § 8.01–52(1). The text includes the "society, companionship, comfort, guidance, kindly offices and advice of the decedent" but does not mention any physical injuries or loss of income or damage to other personal relations that might result from the survivor's emotional suffering.

The Virginia Supreme Court has apparently never interpreted § 8.01–52(1) to extend to such indirect burdens. Rather, the court has suggested in its most similar wrongful death decision that the proper focus for damages excludes the rippling effects of the death. In *Norfolk & Western Railway Company v. Stevens*, 97 Va. 631, 34 S.E. 525 (1899), the decedent's mother offered medical testimony to prove that the death of her son had produced a serious nervous condition and an attack of bronchitis. The trial court accepted the evidence, but the Supreme Court reversed that ruling, holding that the mother's physical injuries, as a matter of law, were not sufficiently connected to the defendant's tortious conduct to be admissible in court. The district court in this case correctly adopted the same reasoning in its analysis of the scope of § 8.01–52(1).

Although indirect physical injuries are thus not compensable in themselves, the court might nevertheless have admitted Mrs. El-Meswari's proffered information to illustrate her claim of direct mental anguish. Virginia law has in some situations not only permitted but required the introduction of such proof to verify an alleged emotional disturbance. *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214, 216–219 (1973), *citing Bowles v. May*, 159 Va. 419, 166 S.E. 550, 557 (1932). And in fact, the district court here did allow some testimony for that purpose. But the court did not err in simultaneously excluding the heart and miscarriage evidence, for the rationale of *Hughes* and *Bowles* weakens when applied

to Mrs. El-Meswari's claim. Unlike the case envisioned by the Virginia Supreme Court in *Hughes* and *Bowles*, this wrongful death action presents little threat of entirely feigned trauma, and no evidence need be advanced to establish the existence of genuine emotional distress. *Gamble v. Hill*, 208 Va. 171, 156 S.E.2d 888, 894 (1967). The probative value of the contested evidence was accordingly slight; at most, the accounts of Mrs. El-Meswari's health would have added secondary corroboration of the misery that the jury could immediately see and hear and assess when Mrs. El-Meswari testified. The prejudicial potential of the evidence, on the other hand, was strong; the jury might well have awarded damages to Mrs. El-Meswari not only for the mental anguish that directly followed Iman's death, but also for the physical injuries that followed from the mental anguish. In these circumstances, the district court did not abuse the discretion granted by Federal Rule of Evidence 403 in excluding evidence of the continuing physical effects of Mrs. El-Meswari's emotional ordeal.

### B.

■ The complaint filed in this lawsuit divided into two parts its presentation of Mrs. El-Meswari's experience. The first count of the complaint, which we have discussed above, sought damages under § 8.01–52(1) for Mrs. El-Meswari and the other family members who had "suffered profound sorrow and mental anguish." This count addressed itself only to the reaction provoked "by reason of the death" of Iman; it did not claim that the survivor's anguish had been heightened by an awareness of Iman's injuries or of the pain that preceded her death. *Cf. Virginia Iron, Coal & Coke Co. v. Odle's Administrator*, 128 Va. 280, 105 S.E. 107, 116 (1920). Mrs. El-Meswari sought compensation for that mental shock in the fourth count of the complaint. Brought as an action in tort, independent of the wrongful death statutes, the count alleged that Mrs. El-Meswari had "witnessed her daughter's agony" and that as a result she "suffered and continues to suffer severe emotional dis-

tress." The district court, concluding that the common law of Virginia would not recognize Mrs. El-Meswari's claim for negligent infliction of emotional distress, dismissed the fourth count of the complaint. We find that that decision correctly predicted the course that the Virginia Supreme Court would take in this situation.

Virginia law does not as an independent goal try to restore mental tranquility shaken by witnessing or contemplating negligently inflicted injury. *Hughes v. Moore*, 214 Va. 27, 197 S.E.2d 214 (1973), in which the court approved recovery by a woman who had watched a car drive onto her front porch, is the leading example in Virginia of the widely shared position that "a bystander who is in a zone of physical danger and who, because of the defendant's negligence, has reasonable fear for his own safety is given a right of action for physical injury or illness resulting from emotional distress." *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 75 Ill.Dec. 211, 457 N.E.2d 1 (1983) (citing cases); *see also Penick v. Mirro*, 189 F.Supp. 947, 948 (E.D. Va.1960) (applying Virginia law). The rationale for unique attention to this particular type of emotional distress is not obvious, but the determination to prevent that protection from reaching the present situation could scarcely be more clear. In *Hughes v. Moore*, the Virginia Supreme Court explicitly anticipated, and rejected, Mrs. El-Meswari's attempted analogy to her case:

Under the rule adopted today we are not saying that a plaintiff, in an action for negligence, may recover damages for physical injuries resulting from fright or shock caused by witnessing injury to another, allegedly occasioned by the negligence of a defendant toward a third person, or caused by seeing the resulting injury to a third person after it has been inflicted through defendant's negligence.

197 S.E.2d at 219–20. *See also Restatement (Second) of Torts* 2d § 313 (1965). To confer a cause of action for distressful contemplation of negligently inflicted injury, even upon an intimate relation of the

injured party, would be a portentous step. When the state supreme court has so unmistakably announced its position, the duty of a federal court in diversity jurisdiction is to apply the expressed law. The district court properly performed that obligation in dismissing the fourth count of the complaint.

## IV

◼ The El-Meswaris also sought punitive damages for Iman's death from the responsible parties. In Virginia, a claim for punitive damages in a wrongful death case is governed by Va.Code § 8.01–52(5), which authorizes recovery for "willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others." Iman's personal representative sought an exemplary recovery under the statute arguing that the actions of Showalter on the roof and of Mitchell on the ground represented "such recklessness as evinces a conscious disregard for the safety of others." The district court granted a directed verdict, remarking that the evidence—even when considered in the light most favorable to plaintiff's position—demonstrated "a classical garden variety case of ordinary negligence where people failed to keep a proper lookout." Because Virginia law would not read into the sadness of what happened a willfulness to make it happen, we decline to disturb that ruling.

Enacted in 1982, the punitive damages provision in § 8.01–52(5) has not yet been analyzed by the Virginia Supreme Court. Because the text corresponds to the established language of the court in cases not brought under the wrongful death statute, this circuit has referred to those decisions to guide the application of state law. *Peacock v. J.C. Penney Co., Inc.*, 764 F.2d 1012, 1014 (4th Cir.1985). In *Peacock*, this court noted that punitive damages would not lie under Virginia law even for gross negligence, that intoxicated driving, though illegal and reckless, would generally support no more than an award for compensatory relief, and that the sole instance where the Virginia Supreme Court permitted a

punitive award in a motor vehicle accident was against a creditor who "ran down his debtor, pinned him under the car, and demanded payment of the debt." 764 F.2d at 1014–15, *citing Friedman v. Jordan*, 166 Va. 65, 184 S.E. 186 (1936).

*Peacock* also discourages any punitive damage claim on the basis that defendants acted in violation of construction safety practice by tossing rather than lowering these particular building materials from the roof. In *Peacock*, defendants failed to equip an old truck with numerous essential safety devices required by state law. A fatal accident resulted from the truck's breakdown on a highway. In the ensuing wrongful death suit, the trial judge's refusal to submit to the jury on anything other than ordinary negligence was sustained.

We feel obliged to follow those decisions. While *Peacock* addressed motor vehicle accidents, it made clear that Virginia law views skeptically the utility of punitive damages as a deterrent to anything less than willful misconduct. The resulting interpretation of § 8.01–52(5) places two burdens upon a plaintiff who seeks to prove that a defendant acted "with such recklessness as evinces a conscious disregard for the safety of others." First, the plaintiff must show that the defendant intended all of the acts or omissions that created an extraordinary risk and that the defendant appreciated or had sufficient information to recognize the magnitude of the risk; *Peacock*, 764 F.2d at 1014; *see also Restatement (Second) of Torts* § 500 and comments (1965). Second, the plaintiff must show that the defendant responsible for such a risk responded to it with "purposeful carelessness, deliberate inattention to known danger, or any intended violation or disregard of the rights of others." *Baker v. Marcus*, 201 Va. 905, 114 S.E.2d 617, 621 (1960). Punitive damages are available under this standard only if the plaintiff satisfies both requirements. *National Carloading Corp. v. Astro Van Lines*, 593 F.2d 559 (4th Cir.1979); *Kaufman v. Abramson*, 363 F.2d 865 (4th Cir.1966).

Reviewed in favor of the El-Meswaris, the evidence in this case addresses only the first of these issues. Showalter's and Mitchell's awareness of the risk to young children is emphasized throughout the record. Showalter and Zimmerman both testified that they told Mitchell to watch for children; all of the workers knew that the building was occupied, that children were playing outside in the afternoon, and that an ice cream truck drove near the building shortly before Showalter dropped the third roll.

The evidence does not, however, suggest any reasonable basis for a jury to find that the defendants showed "deliberate inattention to known danger, or any intended violation or disregard of the rights of others." Cf. Wright & Miller, *Federal Practice and Procedure: Civil*, §§ 2524, 2527. To the contrary, Showalter and Zimmerman testified repeatedly that they watched for children from the roof, that they instructed Mitchell to watch for children from the ground, and that they relied on Mitchell's apparent lookout in throwing the materials. Mitchell said that he was "doing nothing" immediately before Showalter and Zimmerman picked up the rolls, but testified consistently that he was on guard for bystanders, and had followed two children playing in the distance, once the removal began. When the ice cream truck arrived, he redoubled his alertness for children and tried to attract the roofers' attention to tell them to stop.

All too obviously, these efforts failed disastrously. Mitchell's vantage point did not enable him to see around the building corner; he did not notice Iman and could not signal Showalter or Zimmerman; and Showalter, seeing Mitchell on watch and receiving no warning, assumed that the area was clear. But even an unsuccessful attempt to mitigate a created risk is different from culpable inattention to danger. The situation in this case resembles that of *Ford Motor Co. v. Bartholomew*, 224 Va. 421, 297 S.E.2d 675 (1982), in which the plaintiff's evidence showed that the defendant, whose car design had created a substantial risk to its customers, "did not ig-

nore" the problem but tried several protective measures that failed through the defendant's further negligence. *Id.* at 683–84. The Virginia Supreme Court held that a directed verdict denying punitive damages was appropriate because such properly intended, poorly performed efforts did not constitute a conscious disregard of the plaintiff's rights. We believe that the court would reach the same conclusion here.

V

In the claims for expenses, for mental anguish, and for punitive damages, the El-Meswaris pursued recovery for their response to the accident on May 26. In the third count of the complaint, they asked for reparations on Iman's own behalf. This claim involves the relationship between the Virginia wrongful death statute, defining the rights of the decedent's survivors, and Va.Code § 8.01–25, defining the survival of the decedent's rights. The latter enactment provides in relevant part that

Every cause of action whether legal or equitable, which is cognizable in the Commonwealth of Virginia, shall survive either the death of the person against whom the cause of action is or may be asserted, or the death of the person in whose favor the cause of action existed, or the death of both such persons.... Provided, further, that if the cause of action asserted by the decedent in his lifetime was for a personal injury and such decedent dies as a result of the injury complained of with a timely action for damages arising from such injury pending, the action shall be amended in accordance with the provisions of § 8.01–56 [a section of the wrongful death statute].

Arguing that § 8.01–25 preserves beyond death Iman's cause of action for the non-fatal effects of her injuries, Iman's representative sought compensation to the estate for her eight days of pain and suffering from May 26, 1983 to June 3, 1983. The district court dismissed this claim, con-

cluding that § 8.01–25 defers to the wrongful death statute as the exclusive statement of the grievances that Virginia will recognize when a tort victim dies of her injuries. We agree with that ruling.

At common law, entitlements to relief survived neither the death of the plaintiff nor that of the defendant. Virginia's statutory response, prior to 1964, established that

> No cause of action for injuries to person or property shall be lost because of the death of the person in whose favor the action existed, *provided, however, in such action no recovery can be had for mental anguish, pain or suffering.*

*Seymour v. Richardson,* 194 Va. 709, 75 S.E.2d 77, 78 (1953) (emphasis added). Obviously, any petition for redress of Iman's suffering would have been denied under that rule. In 1964, the Virginia legislature deleted the italicized clause of the statute and substituted the words "provided said person's subsequent death was not occasioned by the acts giving rise to such cause of action." *Bagley v. Weaver,* 211 Va. 779, 180 S.E.2d 686, 688 (1971). This amendment permitted compensation for the suffering of a tort victim who had died for reasons unrelated to the actionable injury. *Id.* A person like Iman, however, remained beyond the concern of the survival legislation; the representatives of these decedents could recover only the elements of relief provided by the wrongful death statute. *Semler v. Psychiatric Institute of Washington, D.C.,* 575 F.2d 922 (D.C.Cir. 1978) (applying Virginia law). That remedy, designed to repay the loss to the decedent's survivors rather than the loss to the decedent, allowed no damages for the victim's pain and suffering. *Virginia Iron, Coal & Coke Co. v. Odle's Administrator,* 128 Va. 280, 105 S.E. 107, 116 (1920).

In 1977 the General Assembly again modified the survival statute, adopting the present text of § 8.01–25. Iman's representative reasons that under this act, which eliminates the pre-1964 and 1964 provisos, the tort victim's cause of action will survive any cause of the tort victim's death. Any inference from a silence in the statute is defeated by the force of inference from the final provision of the current statute. The last sentence quoted from § 8.01–25 would require Iman's representative, if Iman had filed suit prior to her death for the injuries, to amend the pending claim to a wrongful death action; consonant with traditional wrongful death purposes, the representative would then be unable to recover for Iman's pain and suffering.

We see no reason why the Virginia Supreme Court would adopt a different approach to the case in which Iman's personal injury suit had not yet been filed at the time of her death. To the contrary, the court hoped in *Seymour v. Richardson* to avoid "the illogic of allowing damages for those elements in an action brought by the injured person and revived in the name of his personal representative, but not in an action for the same cause if brought originally by his personal representative." 75 S.E.2d at 81. Presumably the court would want equally to avoid the converse illogic of allowing damages in an original representative suit but not in a revival action. In either procedural posture, Virginia law considers the suffering of Iman El-Meswari, and the compensation due from that suffering, to be personal to Iman.

### VI

The final issue on appeal turns from the measure of damages to the identification of all liable parties. According to El-Meswari, the circle of responsibility for Iman's death should extend to F.M. Clower, the general contractor, and to West Briar, the building owner. The district court found that these defendants could not have foreseen and therefore did not share in the conduct of Mitchell, Showalter, Davenport Insulation, and Valley Roofing. The court granted summary judgment for Clower and a directed verdict for West Briar. We affirm these rulings.

As implied by the title of an "independent" contractor, the relationship between employer and contractor is not in itself sufficient to require the employer to an-

swer for all injuries caused by the acts of the contractor. *Norfolk and Western Railway Company v. Johnson,* 207 Va. 980, 154 S.E.2d 134, 137 (1967). The employer may incur liability, however, in a variety of exceptional circumstances. *See Restatement (Second) of Torts* §§ 410–429 (1965). Most relevant to the El-Meswaris' claim against Clower and West Briar, Virginia law holds an employer responsible for the consequences of work that "will in the natural course of events produce injury unless special precautions are taken." *Norfolk and Western Railway Company v. Johnson,* 154 S.E.2d at 137. This doctrine of particular risk occupies an intermediate position between the employer's absolute immunity for ordinary contractor negligence and the employer's absolute liability for unavoidably hazardous activities. In individual cases along the continuum, the defendant's responsibility depends upon a foreseeable probability that injury will result from the characteristic risks of the assigned work. *Id.* at 140; *Broaddus v. Standard Drug Company,* 211 Va. 645, 179 S.E.2d 497, 501 (1971); *Restatement (Second) of Torts* §§ 413, 416, 427 (1965).

In this case, the plaintiff presented no evidence suggesting that Clower or West Briar should have foreseen the risk that was realized in Iman's death—the risk introduced by roofing materials that were negligently thrown from the building. Mitchell did testify that "every day something was being dropped from the roof," but the record does not show that either Clower or West Briar was aware of this procedure. Their reasonable expectations are more plausibly reflected in the testimony of the Valley Roofing president that "It was a common practice that we did not throw things off the roof unless it was confined to a chute or to a given area." On this basis the district court concluded correctly that the fatal negligence was attributable to the independent contractor.

That conclusion does not repeat the deficiencies of *Emmerson v. Fay,* 94 Va. 60, 26 S.E. 386 (1896) and *Stagg v. Taylor's Administratrix,* 119 Va. 266, 89 S.E. 237 (1916), cases which the Virginia Supreme Court discredited in *Norfolk and Western Railway Company v. Johnson,* 154 S.E.2d at 138–39. In *Emmerson* and in *Stagg,* the court failed to ask whether the employer's lack of precaution could amount to participation in the decedent's injury; here, the court did ask that question, but it answered that West Briar and Clower were not liable because the tortious conduct was not characteristic of but collateral to the construction enterprise.

### VII

We take no comfort in detailing the limits of recovery from this tragedy. A major element of recovery under wrongful death statutes is frequently the expected loss of income from decedent, *see* Va.Code § 8.01–52(2), yet the death of a five-year old child is not readily presented in such terms. The ability to assuage human grief with money damages is limited, and yet money damages are often the best that law can offer. Even in monetary terms, the solace here would be regarded as a small one, yet that solace is in our system one for state law and trial juries to withhold or give.

We have attempted, as did the trial court, to follow Virginia law with fidelity. The judgment of the district court is affirmed except with respect to the award for Iman's funeral. On that point, the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.

McMILLAN, District Judge (concurring in part and dissenting in part):

The majority uphold the trial court's refusal to submit to the jury an issue of punitive damages. I concur otherwise, but I dissent from that part of the decision.

In 1982, the Virginia wrongful death statute was amended to authorize the recovery of punitive damages for death resulting from "willful or wanton conduct, *or such recklessness as evinces a conscious disregard for the safety of others.*" Virginia Code, Section 8.01–52(5) (emphasis added). The testimony clearly shows that

defendants Mitchell and Showalter (and, through them, their employers) displayed "conscious disregard for the safety of others."

According to *Showalter's* testimony, Zimmerman or Showalter, standing on the roof, yelled down to Mitchell, the project supervisor, asking what they should do with the three remaining rolls of roofing material. Showalter testified that Mitchell told them to toss the rolls off. Zimmerman and Showalter responded that their Valley Roofing supervisor, Adin Rhodes, had instructed them not to throw anything down from the roof. Mitchell then ordered Zimmerman and Showalter to throw "his goddam rolls" off the roof. Apparently anxious about what could happen if the ninety-pound rolls were thrown from the top of the three-story building and aware that Mitchell was disregarding Rhodes' explicit order, Zimmerman asked Mitchell if he would take full responsibility for the throwing of the rolls. Mitchell's response is not recorded in the testimony. Showalter testified that he and Zimmerman urged Mitchell to watch out for children in the area (JA 58). Showalter then threw the first roll. Showalter stated that he tried to throw the first roll out away from the building so he could see where it was going and could see anyone near the area where the roll would land (JA 59). That first roll landed on the asphalt, away from the building. Mitchell then told Showalter not to throw the rolls out onto the asphalt, because that might damage the roofing material (JA 60). Mitchell wanted the rolls dropped onto the grass, closer to the building (JA 60). Zimmerman then dropped the second roll off the edge of the roof, straight onto the grass below. Showalter then stepped to the edge, looked over, and dropped the third and fatal roll, which struck Iman, the deceased, as she darted out from the side of the building where the children had been playing and ran across the grass, heading toward the ice cream truck. Showalter stated that he had seen the ice cream truck pull up a few minutes before he dropped the third roll (JA 59).

According to *Mitchell's* testimony, Zimmerman and Showalter had just finished lowering some galvanized trash cans from the roof, using rope. Mitchell said Zimmerman then walked to the edge of the roof and asked what to do about the rolls. Mitchell agreed that Zimmerman told him that Rhodes had told the Valley workers not to throw anything off the roof (JA 51). Mitchell said he then told Zimmerman and Showalter to walk the rolls down the ladder (JA 51). Mitchell admitted in cross examination that he offered this suggestion sarcastically (JA 214). Mitchell maintained that he did not tell Zimmerman and Showalter to throw the rolls off the roof (JA 190), but he did testify that he was concerned about cost and time (JA 194), and that he "had a good idea that they would probably drop it" (JA 199). Mitchell says he made eye contact with Showalter when he approached the edge of the roof to throw the first roll (JA 201). Mitchell stated that he said nothing to Showalter to stop him from throwing it (JA 202). Mitchell testified that the first roll made what he described as an "intimidating" sound when it landed (JA 215).

*Mitchell also testified that there were always two children playing off to the side of the building while the rolls were being thrown* (JA 215). He stated that he saw the ice cream truck pull up to the building about one minute to ninety seconds before the third roll was thrown (JA 56). Mitchell realized the truck would be a magnet for the children (JA 57). Yet, he also said that *the position he had chosen when acting as the look-out did not give him a view around the right corner of the apartment house, where the children were playing* (JA 57). Mitchell stated he *"wanted* to stop the dropping of the rolls" when he heard the ice cream truck bells (JA 204). *He offered no explanation of why he did not do so.* Mitchell said he saw Iman a second or so before the third roll was thrown. She was "right flush" with the building (JA 217); yet Mitchell said nothing about her presence to Zimmerman or Showalter (JA 202–3). Mitchell testified that he never had a chance to stop

the throwing of the rolls after he saw Iman (JA 217).

In summary: Mitchell was warned by Zimmerman and Showalter that their supervisor had said that nothing was to be thrown from the roof. Mitchell, Zimmerman and Showalter all knew children were playing near the building. Mitchell heard the first roll land with an impact he himself described as intimidating. Even if he did not order the roll-tossing, Mitchell never attempted to stop it. *Mitchell did not stand in a spot where he could see the children's possible approach.* He did not re-position himself to improve his view after hearing the ice cream truck pull up, *despite his acknowledgment that the truck "would draw the children away from their play area to the truck, toward our area"* (JA 216). Mitchell did not make any attempt to tell Zimmerman and Showalter to stop throwing the rolls in what he described as the one minute to ninety second period between the arrival of the ice cream truck and the dropping of the third, the deadly roll.

This conduct by Mitchell as project supervisor and as the lookout upon whom Zimmerman and Showalter relied could obviously satisfy a jury that *Mitchell intentionally disregarded the obvious risk to the children.* Mitchell's instruction to the roofers to throw the rolls off *created the hazard,* and he then *aggravated* the danger by instructing Showalter to drop the rolls straight down rather than tossing them out away from the building (JA 59–60). Showalter testified that he felt his view of activity on the ground was impaired when he had to drop the rolls straight down. He relied on Mitchell to warn him if children appeared so that a roll would not be thrown. In tossing the rolls, even pursuant to Mitchell's emphatic instruction, Showalter also displayed conscious disregard of known danger. He continued to throw the rolls even though he had been specifically instructed not to do so by his regular supervisor and even after Mitchell instructed him to toss them in a way Showalter felt aggravated the already significant danger.

The *act of tossing the rolls,* not simply the manner in which it was done, signals knowing and intentional disregard of the children's safety. Once the roll was dropped, it was out of anyone's control. Even if all had been clear from a scrupulous look-out's vantage point, once a roll weighing approximately ninety pounds was dropped there was no way to prevent it from striking whoever darted out unexpectedly and quickly as children often do. The danger associated with dropping any object from the roof had apparently been considered when *other* material on the roof, such as the galvanized trash cans, had earlier been lowered to the ground with rope. Yet the heaviest and consequently the potentially most lethal objects, the rolls of roofing material, were dropped to the ground.

A half century old recollection about the acceleration of falling bodies is confirmed by Webster's International Dictionary, which (defining "acceleration of gravity") says that in a vacuum, at 45 degrees latitude, a body in free fall accelerates at 980.616 centimeters per second per second, which is almost exactly 32 *feet* per second per second. In the early second or two of a free fall of a heavy compact object, air resistance is negligible. A third story flat apartment roof would hardly be more than 35 or 40 feet above ground. With all due allowance for air resistance, the deadly roll could not have taken over 1½ seconds to reach the ground. The deceased child, beyond doubt, when the roll was dropped, was within five or six steps or less of the place where the death-dealing roll hit her, even if we assume she was running, as children often do when the ice cream truck is near.

The question of punitive damages should be submitted to a jury.

This was not a *"garden* variety" negligent look-out case as the trial court seems to have thought. It is a *"playground* variety" case. Mitchell behaved negligently in failing to keep watch for the children, and the workers all engaged in an unreason-

ably dangerous act, *throwing the rolls from the roof*, in an area where children were playing and in *a location that lay between their play area and their predictable destination, the ice cream truck.* At the most dangerous possible time, the crew persisted in defying contrary instructions and in deviating from previous procedure.

The majority describes what occurred as "an unsuccessful attempt to mitigate a created risk." I can find no evidence of an attempt to mitigate the risk; rather I observe a combination of action and inaction that consistently *maximized* the risk in a way properly characterized as purposeful carelessness, deliberate inattention to known danger, and "conscious disregard of the rights of others."

The ice cream truck was at the curb. The lookout stationed himself where he could not see the children he knew were playing in the area. The workmen threw the deadly rolls and the decedent did what young children do; she darted around the corner toward the siren song of the ice cream truck bell. To throw a heavy roll of roofing off the building under those circumstances is, beyond any question, "conscious disregard" of the safety of the children.

I would leave the decision of punitive damages to the jury, who heard the witnesses and saw the diagram, and knew the lay of the land, rather than presume that the courts of Virginia would, on these facts, deny an award of punitive damages.

The Virginia Supreme Court's skepticism regarding the circumstances in which punitive damages are appropriate has not previously been interpreted by this circuit to preclude punitive awards outside the context of automobile accidents. In *Kaufman v. Abramson*, 363 F.2d 865 (4th Cir.1966), cited approvingly by the majority as a statement of the standard of proof in punitive damages claims, this court upheld an award of punitive damages under Virginia law, in a non-automotive context. There, despite his awareness of an elderly lessee's frail health, a lessor, in an attempt to evict the plaintiff-lessee, discontinued all electric service to her apartment. That evidence was held sufficient for a finding that the lessee was entitled to punitive damages because the lessor had displayed conscious disregard of the plaintiff's rights.

The majority cite *Baker v. Marcus*, 201 Va. 905, 114 S.E.2d 617 (1960), and *Peacock v. J.C. Penney Co., Inc.*, 764 F.2d 1012 (4th Cir.1985), as illustrations of the limited availability of punitive damages under Virginia law. *Baker* (an accident case involving a driver whose state of intoxication was described as a "borderline case" (114 S.E.2d at 619)) says that to receive punitive damages the plaintiff must demonstrate that the defendant showed "conscious disregard for the rights of another" and knowledge that his action "will probably result in injury." 114 S.E.2d at 621. In *Baker*, the Virginia Supreme Court offered this assessment of the defendant's conduct:

"In the case before us, Mrs. Baker did not see the Marcus car and deliberately run into it. She had nothing personal against Marcus, nor the desire to do anyone harm. The evidence shows a typical rear end collision as a result of a lack of the use of ordinary care and caution. That Mrs. Baker did not keep a proper lookout is manifest, and her failure to do so constituted negligence. Her conduct may have been partly due to the intoxicants which she had imbibed; *but there is nothing to show that she acted in a spirit of mischief, criminal indifference, or conscious disregard* of the rights of others. Her conduct, after the collision, showed no motive to injure the plaintiff, or ill will toward him. She was then injured, and according to all the testimony she was dazed and hysterical. In momentarily taking her eyes off the road, she was guilty of a misadventure, which amounted to simple negligence, and a mistake which is likely to cause an injurious result in automobile traffic at any time and place. The evidence *presents no indicia of purposeful careless, deliberate inattention to known danger, or any intended violation or*

*disregard of the rights of others on the highway.* The accident which occurred could have happened to anyone under the circumstances mentioned, and the damages inflicted would have been the same whether or not the wrongdoer was sober or under the influence of intoxicants."

114 S.E.2d at 621–2.

The *Baker* court concluded from the facts of that case that nothing more than a moment of careless driving was involved. *Baker* distinguished the slightly intoxicated driver from a willful or wanton tortfeasor, against whom punitive damages could properly be assessed, by classifying the defendant's conduct as a "mistake" or "misadventure."

The defendants' conduct in the case before us cannot fairly be treated as a mistake or misadventure.

In *Essex v. Commonwealth,* 228 Va. 273, 322 S.E.2d 216 (1984), a prosecution for murder by vehicle while driving drunk, the Supreme Court of Virginia construed *Baker v. Marcus* in a way that limits, if not eliminates, its applicability in the *Peacock* decision and in the present case. By a divided vote, *Essex* held that a murder conviction was not sustainable based upon a violation of the drunk driving law. The pertinent portion of the opinion follows:

> In *Baker v. Marcus,* 201 Va. 905, 114 S.E.2d 617 (1960), we considered, in a civil context, *whether malice could be inferred* from drunken driving *so as to support an award of punitive damages.* There we said: "One who knowingly drives his automobile on the highway under the influence of intoxicants, in violation of statute is, of course, negligent. It is a wrong, reckless and unlawful thing to do; but it is not necessarily a *malicious* act." *Id.* at 910, 114 S.E.2d at 621. A sober driver may be eminently *malicious,* while a drunken driver may be merely reckless.

322 S.E.2d at 221 (emphasis added). The *Essex* decision reveals that the Supreme Court of Virginia reads *Baker v. Marcus* as having required a finding of *malice as a prerequisite to an award of punitive damages.*

*Such a possible prerequisite was eliminated from the punitive damages portion of the Virginia wrongful death statute by the plain language chosen by the Virginia legislature in 1982.* That language, Section 8.01–52(5) of the Virginia Wrongful Death Act is:

> ¶ 5. "Punitive damages *may* be recovered for wilful or wanton conduct, *or* such recklessness as evinces a conscious disregard for the safety of others." (Emphasis added.)

By relying in *Peacock* on cases such as *Baker,* this court appears to have assumed that despite the express language of the new remedial 1982 Virginia statute, it continues to be necessary to find "malice" before punitive damages can be awarded. The legislature has stated the basis for recovery of punitive damages in plain language which excludes malice. I respectfully submit that this court should not resurrect a malice standard that the legislature of the Commonwealth of Virginia had interred. *Peacock,* therefore, should not preclude submission of the punitive damages question to the jury.

\*       \*       \*

If, upon proper submission of the issue of defendant Mitchell's liability for punitive damages, the jury finds him so liable, the punitive damages liability of his employer, Davenport, will also become an issue for the jury. According to the Restatement (Second) of Torts § 909 and Restatement of Agency § 217(C):

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and manner of the act, or
>
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

The trial judge refused to grant pretrial summary judgment in favor of Davenport on this issue. He found a genuine issue of material fact as to whether Mitchell was a supervisory employee or managerial agent of Davenport. From the limited evidence on this issue presented in the joint appendix, the testimony of Frank Clower, the general contractor retained by the building owner West Briar, presents an issue of fact for the jury as to Mitchell's status and authority. Clower testified that when he contracted with Davenport to work on the apartment complex he dealt with Mitchell (JA 62). Mitchell signed the contract with West Briar. Another Davenport representative, Fred Boswell, also signed the West Briar contract, with Mitchell signing as the salesman (JA 62a). However, Clower testified that he negotiated the agreement with Mitchell and that it was his understanding that Mitchell would supervise the West Briar job (JA 62a). Clower testified that he was on the job site from seven in the morning until five in the evening every day (JA 62b) and that he observed Mitchell directing the men "putting insulation on the roof and all other operations of the job" (JA 63). In addition, J. Large, the police officer who arrived on the scene after the accident, testified that Mitchell had identified himself to the officer as "the foreman for the Davenport Company" (JA 65).

The complete record may contain additional information on Mitchell's relationship to Davenport, but the evidence presented here provides an adequate basis for a jury finding that Davenport is liable for Mitchell's acts.

\* \* \*

The majority correctly recognizes that the relief the law can offer to the child's grieving parents is limited and painfully small when compared to the magnitude of their loss. I agree; however, the inadequacy of the available relief is no reason to deny the relief that is available.

On punitive damages, I would reverse.