**E.G. THOMPSON and Betty Thompson, Plaintiffs–Appellants,**

v.

**STATE FARM FIRE AND CASUALTY COMPANY, Defendant–Appellee.**

No. 93–7054.

United States Court of Appeals, Tenth Circuit.

Aug. 9, 1994.

Harry Scoufos, Law Offices of Harry Scoufos, P.C., Sallisaw, Oklahoma (Harvey L. Chaffin, Tahlequah, OK with him on the brief), for plaintiffs-appellants.

Jerry Fraley (Allison Herzfeld with him on the brief), of Cathcart, Gofton & Fraley, Oklahoma City, OK, for defendant-appellee.

Before BALDOCK, Circuit Judge and EBEL, Circuit Judge and SHADUR, Senior District Judge *.

SHADUR, Senior District Judge.

E.G. Thompson ("E.G.") and his wife Betty ("Betty"), collectively "Thompsons," sued State Farm Fire & Casualty Company ("State Farm") to collect the proceeds of an insurance policy ("Policy") covering a building that had been destroyed by fire and to collect other damages stemming from State Farm's conduct in handling Thompsons' claim. At the conclusion of the jury trial a verdict was returned in State Farm's favor. Thompsons appeal on several grounds, all of which we conclude are without merit.

Thompsons' arguments seeking a new trial can be grouped into five general categories.

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

Four of those relate to rulings by the district judge:

1. her refusal to include among the jury instructions:

 (a) Oklahoma Uniform Jury Instructions—Civil ("OUJI") No. 17.7 and 17.8 (1982) and

 (b) an instruction reflecting provisions of the Oklahoma Unfair Settlement Practices Act (the "Act"), Okla.Stat.Ann. tit. 36, §§ 1221–1228 (West 1994);

2. her evidentiary rulings as to proposed testimony:

 (a) on E.G.'s medical condition (including proposed testimony by an expert on that issue),

 (b) on the fire's point of origin and

 (c) by an expert on the issue of unfair settlement practices;

3. her grant of a judgment as a matter of law dismissing Thompsons' claim of intentional infliction of emotional distress, and her refusal to submit the issue of punitive damages to the jury; and

4. her restriction of closing argument to 20 minutes for each side;

while the last claimed ground stems from the jury's allegedly inconsistent answers to interrogatories in the verdict form.

### Facts [1]

On the night of June 6, 1991 a house that Thompsons owned and had rented out, but that had been unoccupied during the preceding week after the tenants moved out, was destroyed in a fire that the parties have stipulated was set intentionally. Thompsons were at home when the fire started, and the insured property was only a short walk down a path from the Thompsons' own residence.

After Thompsons put in a claim under the Policy covering the building, its contents and the loss of rental value, State Farm sent claim representative Morty Sands ("Sands") to review Thompsons' financial condition in order to determine whether they had a motive to set the fire. As part of that investigation Thompsons gave examinations under

oath on September 11, 1991 as required by the Policy.

During that examination Thompsons told Sands that the sale of their Tah–Mels Jewelry Store business ("Tah–Mels") for $700,000 to $750,000 "was imminent." Sands then took a recorded statement from the realtor with whom Tah–Mels was listed for sale, Helen Morris ("Morris"), who not only negated any "imminent" sale but said that "there had been no offers made, and no serious lookers."

At trial Betty confirmed that during the September 1991 examination she had stated under oath that Tah–Mels would sell in a week for $700,000, that "these were very serious buyers, and the sale had been planned for some three months before that date." E.G. testified at trial that at the time he spoke to State Farm he believed a sale of Tah–Mels was "impending" because Morris had told him she had the business sold for $750,000 and "The deal is going to go through." But he said that Morris "killed the sale" shortly after Thompsons had given their September 1991 statements to Sands. Thompsons ascribed the killing of the purported sale to Morris' having made direct contact with Orville Munson ("Munson"), the owner of the Tah–Mels real estate (but not of the business).

Munson testified at trial that he had sold the Tah–Mels business to Thompsons in 1984 but had retained the land and building in which the business was conducted. Thompsons had an option to buy that real estate for $116,000, so that if they sold it for a greater amount they could keep the difference.

For her part, Morris testified that she listed Tah–Mels and the real estate for sale from November 8, 1990 through October 1992, listing the building alone for $275,000 and the entire property plus the business inventory for $775,000. She denied ever having told Thompsons that she "had a buyer willing to pay $700,000 to $750,000 for the store." Instead she testified that during the two years she had attempted to sell the

---

**1.** What follows in this section will suffice for discussion of most of the issues. To the extent that added facts are needed in connection with

any of the substantive discussion, they will be set out in later sections.

property, the first and only offer she ever had was a $90,000 offer for the real estate from the Cherokee Nation in October *1992* (fully a year after Thompsons' September 1991 statements to the State Farm representative). When Thompsons then made a counter demand of $250,000, Morris found the Cherokee Nation totally unreceptive to that price (they had obtained an appraisal that valued the property at $150,000). Morris then inquired of the tax assessor as to the valuation for tax purposes and learned for the first time that Thompsons did not own the property—Munson and his wife did. Morris then spoke with Munson to see if he was interested in the Cherokee Nation offer. In any event, no sale ultimately went through.

During Sands' investigation Thompsons also told her of another supposedly "imminent" sale, this one involving the sale of their stock in Honduran Gold Mines, Ltd. ("Honduran") to a "Japanese concern" for $3.5 million. Thompsons asked Sands not to communicate with either the purchaser or Honduran's officials for fear of ruining the sale. Later Thompsons' lawyer gave Sands a telephone number for the company, but the number was no longer in service. Then Sands investigated further and found the place where Honduran had previously been located—an office in a shopping center—but was unable to find any current location for the company.

E.G. testified at trial that he had told State Farm during the September 11, 1991 examination that he owned 6 million shares of Honduran stock (about 5% of the company) and that he believed an investor "was about to pump several million dollars into the company." [2] Betty confirmed that during the September 11, 1991 examination she had said

that a sale of the stock would take place within 90 days and that Thompsons had gone to Dallas and visited Honduran President Jerry Griffin ("Griffin") on June 5, 1991 (the day before the fire). Griffin's deposition (read into evidence in part during the trial) reflected that Thompsons had shown up uninvited and without notice on that date, and that he then told Thompsons that two offers to purchase part of Honduran had been rejected (Thompsons were generally familiar with the company's affairs, both being members of its Board of Directors). However, Griffin's deposition confirmed his belief at the time of the June 5 visit that an infusion of cash was likely because of the interest of still another party. Munson also testified that he owned some stock in Honduran and that as of June 1991 he "thought sure that there was a sale," though none had taken place then. Indeed the record reflects that no such sale had occurred since then either.

*Jury Instructions*

◼ In deciding a challenge to jury instructions on appeal (*Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424 (10th Cir. 1993)):

> this court examines the record as a whole to determine whether the instructions state the applicable law and provide the jury with an appropriate understanding of the issues and legal standards to apply.

Even where an instruction is erroneous, we will reverse "only if the error is determined to have been prejudicial after reviewing the record as a whole" (*Brown v. Wal–Mart Stores, Inc.*, 11 F.3d 1559, 1564 (10th Cir. 1993)). In a diversity case such as this the substantive correctness of a jury instruction

---

2. When E.G. had been examined under oath during January 1992 in an unrelated lawsuit, he had testified that he had sold that stock 2½ years earlier (fully two years before his September 1991 statement to State Farm). After the information about his earlier wholly inconsistent statement had been elicited during his cross-examination at the current trial, he testified during redirect examination by his own counsel that he (or perhaps he and Betty) had always owned and possessed the Honduran shares and still did (though he would not dispute the possibility that at one time the shares could have been trans-

ferred to the Tallyho Corporation, a company that he and Betty formed in June 1991). Despite the efforts of Thompsons' counsel to paper over the differences between the inconsistent versions to which E.G. had sworn at different times, by definition no possible transfer to Tallyho could explain away a testified-to sale of the Honduran stock two years before Tallyho ever came into existence. In any event, E.G.'s contradictory versions were part of the factual matrix available to the jury in evaluating his credibility and the materiality of Thompsons' misrepresentations.

is a matter of state law, "but the question of whether error is harmless is one of federal law" (*Hinds v. General Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993)).

### 1. *Oklahoma Law of Fraud*

■ Thompsons argue that the magistrate judge improperly instructed the jury on the applicable law of fraud, given the evidence adduced at trial. In that respect Oklahoma requires that the following provision (Okla. Stat.Ann. tit. 36, § 4803.G (West 1994)) be included in every fire insurance policy (*id.* § 4803.A and .B):

> Concealment, fraud. This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

Although the record before us does not include a copy of the Policy itself, the litigants have proceeded as though the Policy contains that provision, and we will so assume.

Here is the jury instruction given by the district judge in that respect:

> Defendant has asserted the claim that the plaintiffs violated the concealment or fraud conditions of the policy. In order to prevail on this claim, defendant must prove each of the following elements. First: that the policy in force and effect contained a concealment or fraud provision.
>
> Second, that the plaintiffs breached this provision; third, this breach was willful, and that the concealment of information was [a] misrepresentation of information made with the intent to defraud or deceive.
>
> If you find that the defendant has proven that the plaintiffs violated the concealment or fraud provision in the presentation of the claim, then you must find for defendant, and against the plaintiffs, on their claim under the policy. Defendant only needs to prove that the plaintiffs intention-

ally concealed or misrepresented a material fact relating to the insurance policy. It is not necessary that defendant actually have been misled by the plaintiffs' alleged misrepresentation in order for defendant to prevail on the concealment and fraud defense.

> A fact is material if a reasonably, careful person, under the circumstances, would attach importance to it, in determining his course of action, or if the person stating it knows, or a person conceals it, knowing that the person with whom he is dealing, will very likely regard [it] as important in determining his course of action.

Thompsons contend that because they believed the sale of their Honduran stock and the Tah–Mels business were imminent when they spoke to State Farm, but those sales did not in fact take place, the jury should have been instructed on the law of fraudulent statements as to future intentions and representations. For that purpose Thompsons tendered instructions based on OUJI Nos. 17.7 and 17.8, which read: [3]

> Statements of Future Intentions or Promises: The failure of a person (to perform a promised future act) (to carry out a stated intention) does not constitute a false representation of a past or present fact unless at the time he (made the promise) (stated his intention) he did not then intend to (perform the promise) (carry out the stated intention) and he (made the promise) (stated his intention) with the intent to deceive the promisee into acting when he otherwise would not have done so.
>
> Statements About the Future as False Representations: To constitute actionable fraud, false representations must generally relate to present or preexisting fact, and cannot ordinarily be predicated on representations or statements which involve matters that (may) (may not) occur in the future. However, if a promise about the future is made with an intention not to perform it, and is made for the purpose of deceiving the person to whom it was made,

---

**3.** Unfortunately another of the gaps in the partial record that has been provided to us by the parties is the text of the actual instructions submitted by Thompsons. But as the ensuing discussion reflects, the rejection of Thompsons' position does not at all hinge on the particular language involved.

and inducing him to act, such actions constitute fraud.

According to Thompsons, the district judge's failure to give those added instructions confused the jury as to the applicable legal standard, resulting in reversible error. As the ensuing discussion demonstrates, however, that assertion discloses a basic misunderstanding on Thompsons' part and not on the part of the district judge.

■ *Citation Co. Realtors, Inc. v. Lyon,* 610 P.2d 788, 790 (Okla.1980) reflects the familiar distinction between fraudulent statements as to future intentions or representations and conventional fraud stemming from misrepresentations as to past or present facts:

> Oklahoma follows the view that fraud can be predicated upon a promise to do a thing in the future when the intent of the promisor is otherwise. This principle is an exception to the general rule that for a false representation to be the basis of fraud, such representation must be relative to existing facts or those which previously existed, and not as to promises as to future acts. As stated in *Blackburn v. Morrison,* 29 Okl. 510, 118 P. 402 (1910), the exception to the general rule obtains where the promise to act in the future is accompanied by an intention not to perform and the promise is made with the intent to deceive the promisee into acting where he otherwise would not have done so.

Accord, *Furr v. Thomas,* 817 P.2d 1268, 1272 (Okla.1991); *Hall v. Edge,* 782 P.2d 122, 128 n. 4 (Okla.1989). As to what the Oklahoma Supreme Court has identified as "the exception to the general rule," it rests on the notion that at the time someone made a statement regarding some future event over whose occurrence the speaker had some control, the speaker's *subjective* intent was not to bring that event to fruition (*Tice v. Tice,* 672 P.2d 1168, 1171 (Okla.1983) ("Fraud can be predicated upon a promise to do a thing in the future when the promisor's intent is otherwise."); cf. *Rajala v. Allied Corp.,* 919 F.2d 610, 631–32 (10th Cir.1990) (Kansas law); *Mackey v. Burke,* 751 F.2d 322, 328 (10th Cir.1984) (same)). In that respect it is wholly irrelevant that the statement included no

falsity as to any other present or past facts—things that could be shown to be false in *objective* terms (as would be present in a typical instance of such more conventional fraud, as in *Varn v. Maloney,* 516 P.2d 1328, 1332 (Okla.1973)). It is of course possible that a specific situation may implicate both forms of fraud, but because they are analytically distinct the existence of one does not require the presence of the other.

Thompsons' argument seeks to gloss over the natural import of their statements concerning the assertedly "imminent" sales of their Tah–Mels business and Honduran stock. In each instance what was material was whether those statements of imminency were themselves true when made, not whether such sales were later realized (or, as in the exception expressed in *Citation Realtors* and like cases, whether Thompsons presently intended that they would go through with such a sale if it became a reality). After all, the relevancy of the statements to State Farm's investigation was in showing that Thompsons owned assets that had sufficient value and had a sufficient prospect of early realization to negate the inference that they had a financial incentive to burn their own building. And as such, the statements were material to the extent that they reflected or did not reflect *present* facts, not Thompsons' *future* intentions.

From that perspective the jury was surely entitled to conclude (an understatement if there ever was one) that as of the time of Thompsons' September 11, 1991 examination there was no party interested in buying the Tah–Mels business and the real estate in which it was carried on for any amount, let alone for the $700,000 to $750,000 that Thompsons recounted to Sands. If the jury so decided, Thompsons' assertion of the purportedly imminent sale was surely an overt misrepresentation as to present facts.

As for the Honduran stock, although there was evidence apart from E.G.'s own statement that would support the notion that as of the time of the fire or as of the time of Thompsons' September 11, 1991 statements an infusion of substantial cash might possibly be in the offing, the jury could more than reasonably determine that Thompsons' more

positive and precise representations to Sands—their statements as to a totally non-existent "imminent" sale to a "Japanese concern" for $3.5 million—were without factual support. And a rational jury could even independently view E.G.'s statement about having sold the stock in 1989 as negating the idea that Thompsons had anything to sell in 1991 to begin with. In either or both of those instances, as with the Tah–Mels situation, the material representations were of *present* facts and not of *future* intentions.

All of that being so, it was entirely proper for the district judge to have instructed the jury in terms of conventional fraud (a matter that Thompsons do not challenge as such, and on which the jury instruction followed established Oklahoma law). As for Thompsons' notion that an added instruction dealing with fraud as to their future intentions was needed for clarification, no such instruction was appropriate absent evidence that the Thompsons, at the time they made their statements to Sands, had no present intention to proceed with any sales that might develop. Because any such evidence was lacking, it would have been wholly inappropriate to go to the jury with that legal rule (*Rajala*, 919 F.2d at 632; *Mackey*, 751 F.2d at 328–29). Indeed, we can think of nothing more likely to confuse a jury that has already been provided with a clear and correct instruction of the law than to be given still another instruction that has some similarities to and some differences from the first instruction, but that is without any appropriate factual anchor in the evidence that the jury has heard.

## 2. Instruction Based on the Act

■ Thompsons also complain of the district judge's refusal to instruct the jury in the verbatim language of the Act, even though they acknowledge that the statute does not create a private right of action (*Gianfillippo v. Northland Casualty Co.*, 861 P.2d 308, 310 (Okla.1993), following *Walker v. Chouteau Lime Co.*, 849 P.2d 1085, 1086–87 (Okla.1993)). As Thompsons would have it,

such an instruction should have been given because "[t]he act sets standards for normative behavior of insurance companies by which good faith and bad faith may be judged."

Here the jury was already instructed as to the implied covenant of good faith built into every insurance contract, so that State Farm would become liable for any detriment proximately caused by any actions on its part that were unreasonable and in bad faith. State Farm's duty was expressly described as one requiring it "to deal fairly and in good faith" with Thompsons. Given the fact that the Oklahoma Supreme Court squarely negates the Act as a source of recovery and the principle that jurors may properly be viewed as capable of evaluating good and bad faith (just as they regularly determine what constitutes the conduct of a "reasonable" person) by bringing their own common sense and life experience to bear, we view it as well within the district judge's discretion to have refused an added instruction offered only to demonstrate normative behavior—and thus offered to complement a standard that the jury could readily apply on its own.[4]

### Evidentiary Rulings

■ Where a trial judge excludes evidence and the offering party has interposed a proper objection at trial, we will reverse only if the exclusion is an abuse of discretion that results in "manifest injustice to the parties" (*Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 960 (10th Cir.1993), quoting *Comcoa, Inc. v. NEC Tels., Inc.*, 931 F.2d 655, 663 (10th Cir.1991)). Again Thompsons fail that test in each instance.

### 1. E.G.'s Medical Condition

■ Thompsons' counsel wanted to question E.G. about (1) the fact that as a result of a fall he suffered from epileptic seizures and (2) the medication that he took in that respect. Counsel was seeking to boost E.G.'s credibility by explaining why, during his cross-examination by State Farm's counsel, he was unable to recall earlier statements

---

**4.** It is worth noting as well that the instruction that was tendered by Thompsons' counsel would itself have been a source of confusion, because its

parroting of Okla.Stat.Ann. tit. 36, § 1222 (West 1994) referred to so many insurance company practices that were totally irrelevant to this case.

that he had made and deposition testimony that he had given about his stock and his business. When State Farm objected, the district judge applied Fed.R.Evid. 403 to limit the questioning as to whether the fall (about which the jury had heard) had affected E.G.'s memory, expressly precluding Thompsons' counsel from delving into E.G.'s medical condition and medication.

Under Fed.R.Evid. 403 (*Perlmutter v. United States Gypsum Co.*, 4 F.3d 864, 871 (10th Cir.1993)):

> The trial judge conducts a balancing of the probative value of the evidence against its potentially prejudicial, confusing, or misleading effect.

And that balancing (like all other evidentiary rulings) is reviewed under an abuse of discretion standard (*Joseph v. Terminix Int'l Co.*, 17 F.3d 1282, 1284 (10th Cir.1994)).

Here the district judge's acceptance of State Farm's expressed concern as to unfair prejudice stemming from the proposed lines of examination was well within her discretion. In this instance the jury had already learned of E.G.'s earlier heart attack (although the jury had been instructed to disregard that fact), and for E.G. to tell them also of his seizures would carry the potential of an inappropriate appeal to the jury's sympathy. Because the proffered evidence was irrelevant of itself, bearing only on E.G.'s loss of memory, the district judge's decision to admit evidence of the latter but not of E.G.'s seizures and medication reflected a fair balancing under the rule.

■ Thompsons relatedly complain of the district judge's refusal to allow E.G.'s cardiologist Dr. William Ross ("Dr. Ross") to testify as to E.G.'s medical condition. In this instance Dr. Ross had been omitted from the witness lists that the parties had exchanged some months ahead of trial, pursuant to court order. Thompsons claim that the omission was inadvertent, and we do not question that assertion.

■ Exclusion of a witness not listed as required by a pretrial order is also reviewed for an abuse of discretion (*Grant v. Brandt*, 796 F.2d 351, 355 (10th Cir.1986)). Hence the district judge's ruling will be overturned

only if it "resulted in manifest injustice" to Thompsons (*id.; Long v. Laramie County Community College Dist.*, 840 F.2d 743, 750 (10th Cir.1988)). That cannot be the case here, given our ruling as to the exclusion of E.G.'s testimony on the same subject.

### 2. *Fire's Point of Origin*

■ Thompsons also contend that the district judge improperly barred questioning as to the fire's point of origin in the building. State Farm objected on relevancy grounds, given the parties' stipulation that the fire was incendiary in origin and had been and set intentionally. Thompsons respond that because two or three people had identified different places as the point of origin, State Farm's failure properly to investigate that issue evidences a "slip shod" investigation, in turn supporting a finding of bad faith in breach of its already-mentioned duty under Oklahoma law to act in good faith toward its insured.

Of course only relevant evidence is admissible (Fed.R.Evid. 402; *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1424 (10th Cir.1991)), and Thompsons' mere assertion does not make the point of origin of the fire relevant to State Farm's duty to make a good faith assessment of Thompsons' claim of loss. Once State Farm had established that an incendiary fire had destroyed the building, all that was directly relevant to its investigation was who set it: If it were Thompsons, State Farm had no obligation to honor their claim under the Policy; but if someone else had done so (without Thompsons' contrivance), that contractual commitment remained. On that score Thompsons have offered no suggestion as to the relevancy of the offered evidence to State Farm's good faith vel non, and we can think of none. Thus the district judge properly barred Thompsons from questioning State Farm's witness on an irrelevant issue (*FDIC v. United Pacific Ins. Co.*, 20 F.3d 1070, 1081–82 (10th Cir.1994)).

### 3. *Expert Testimony on Unfair Settlement Practices*

■ Lastly Thompsons attack the exclusion of another proposed witness who had

inadvertently been omitted from their witness list—this time John Hammond ("Hammond"), whom they describe as an expert in "bad faith denial and investigation of insurance claims." Hammond was offered as an expert witness under Fed.R.Evid. 702, assertedly so that the jury would be able to compare State Farm's actions "to the industry standard and the laws of the State of Oklahoma."

What we have already said as to the Act's not creating a private right of action casts a cloud on the relevance (and hence the admissibility) of any testimony (expert or otherwise) in that respect under Fed.R.Evid. 402 (*United States v. Gallegos,* 975 F.2d 710, 711–12 (10th Cir.1992)). And what we have already said as to the jury's competence to deal with the bad faith issue on its own confirms the discretionary power of the magistrate judge to bar testimony by the asserted expert. It must be remembered that Fed.R.Evid. 702 includes a requirement that the testimony will "assist the trier of fact to understand or to determine a fact in issue," a requirement that "goes primarily to relevance" (*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)). And as we said in *Werth v. Makita Elec. Works, Ltd.,* 950 F.2d 643, 648 (10th Cir.1991), under Fed.R.Evid. 702 "the 'touchstone' of admissibility is helpfulness to the trier of fact."

Expert testimony, like any other evidence, is subject to exclusion if it fails the Fed. R.Evid. 403 balancing test (*United States v. Onumonu,* 967 F.2d 782, 786 (2d Cir.1991)). And where as here expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally "assist the trier of fact," while it must be viewed as a "needless presentation" (Fed. R.Evid. 403) for the reasons that we have already explained. That conclusively negates any "manifest injustice" by reason of Thompsons' not being able to add and later call Hammond as a witness.

*Partial Judgments as a Matter of Law*

 Thompsons challenge the magistrate judge's grant of a judgment in State Farm's favor on Thompsons' claim of intentional infliction of emotional distress. That ruling (which the parties mislabel as a directed verdict, employing the now-outmoded terminology under Fed.R.Civ.P. ("Rule") 50(a)(1)) was grounded on the district judge's determination that two elements of a prima facie case were lacking:

1. a showing that State Farm's conduct was extreme and outrageous; and

2. a showing that "physical impairment or severe emotional distress resulted."

Thompsons link their challenge under Rule 50(a)(1) to another claimed error by the district judge: her refusal to instruct the jury on punitive damages in connection with Thompsons' claim that State Farm acted in bad faith in processing their insurance claim. That ruling was in turn predicated on Thompsons' failure to present any evidence of "wanton, willful, malicious, or intentional conduct" on State Farm's part.

 We stand in the shoes of a trial court when passing on its grant of a Rule 50(a)(1) motion—that is, we review that decision de novo and apply the same legal standards as did the trial judge (*Knight v. Snap–On Tools Corp.,* 3 F.3d 1398, 1401 (10th Cir.1993)). Just as with a grant of summary judgment under Rule 56, judgment as a matter of law is appropriate only where, with reasonable inferences from the evidence drawn in the nonmovant's favor, a jury verdict in its favor would be improper (*Rajala,* 919 F.2d at 615). And in a diversity case such as this, "we examine the evidence in terms of the underlying burden of proof as dictated by state law" (*Vasey v. Martin Marietta Corp.,* 29 F.3d 1460 (10th Cir.1994)).

 As to Thompsons' intentional infliction of emotional distress claim, we noted in *Katzer v. Baldor Elec. Co.,* 969 F.2d 935, 939 (10th Cir.1992) that Oklahoma applies the standards laid down in Restatement (Second) of Torts § 46 (1977). Under that standard (*Breeden v. League Serv. Corp.,* 575 P.2d 1374, 1377 (Okla.1978)):

The court, in the first instance, must determine whether the defendant's conduct *may* reasonably be regarded *so extreme and*

*outrageous* as to permit recovery, or whether it is necessarily so. Where, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability.

Accord, *Smith v. Farmers Coop. Ass'n,* 825 P.2d 1323, 1327 (Okla.1992). In that respect, mere unreasonableness of behavior will not suffice. Rather defendant's conduct must be "beyond all possible bounds of decency in the setting in which it occurred," or "utterly intolerable in a civilized community" (*Eddy v. Brown,* 715 P.2d 74, 77 (Okla.1986) (internal quotation marks omitted)). Additionally, while it is for the court to determine whether "*severe emotional distress* can be found" (*Breeden,* 575 P.2d at 1377), even if such distress exists an absence of extreme and outrageous behavior precludes recovery as a matter of law (*id.* at 1378).

Here are the matters that Thompsons say tend to support their claim of intentional infliction of emotional distress:

1. State Farm's agent and adjuster refused to help them fill out the proof of loss form.

2. State Farm's agent advised E.G. not to hire a lawyer in connection with the claim.

3. State Farm continually asked for more information, claimed forms were improperly filled out and failed to return calls and to keep appointments, all of those actions serving to drag out the claims process.

4. State Farm spoke with neighbors when investigating the fire, affecting Thompsons' relationship with them.

5. State Farm's interference prevented the sale of Thompsons' business going through.

6. After the fire State Farm cancelled Thompsons' insurance.

Even if all those items—a number of which are extraordinarily dubious under the evidence—were to be credited (and thus viewed in the light most favorable to Thompsons), as a matter of law they do not amount to extreme and outrageous behavior.

At worst it may have been less than courteous for State Farm not to have helped to fill out the claim form. Advice not to hire a lawyer may be bad advice (though not always)—but it is surely not beyond the bounds of decency. As for policy cancellation, to deprive insurance companies of that privilege generally (which would be the effect of declaring it to be extreme and outrageous conduct) would make no sense in free market or any other terms. And more specifically on the facts of this case, where State Farm had material evidence (more than enough to present the issue to the jury) that Thompsons themselves had set the fire, the cancellation clearly cannot be attacked on those grounds.

All of the other matters on which Thompsons seek to rely concern the manner in which State Farm investigated their claim. While State Farm may have exhibited a lack of tender solicitude for Thompsons, clearly its conduct did not amount to the type of harassment and threats that could be considered extreme and outrageous (compare the facts that were similarly found insufficient in such cases as *Breeden,* 575 P.2d at 1378 and *Haynes v. South Community Hosp. Management, Inc.,* 793 P.2d 303, 307 (Okla.Ct.App. 1990)).

In sum, the evidence simply does not support submission of the issue of extreme and outrageous conduct to the jury. That alone is enough to affirm the district judge's Rule 50(a)(1) judgment, without any need to determine the existence or nonexistence of severe emotional distress.

■■■ We turn to the district judge's refusal to submit the punitive damages issue to the jury—effectively the equivalent of a judgment in State Farm's favor on that issue as a matter of law. On that score the district judge correctly stated Oklahoma law, albeit in slightly different words. Under state law it is the duty of the trial judge to determine whether there is sufficient evidence of "fraud, oppression, gross negligence or malice, actual or presumed" from "wilful acts" to present the issue to the jury (*McLaughlin v. National Benefit Life Ins. Co.,* 772 P.2d 383,

387 (Okla.1988)). Here the record amply discloses evidence in support of State Farm's legitimate belief that it had no obligation to honor Thompsons' claim. As a matter of law, State Farm's actions in investigating the validity of that belief cannot be said to have been sufficiently egregious to allow the award of punitive damages.

■ Indeed, we should observe as to both issues discussed in this section that Thompsons cannot complain in any event, because the jury found State Farm did not act in bad faith anyway. That being so, it would have been legally impossible for the jury either to award punitive damages on that issue or to find intentional infliction of emotional distress (a tort that requires behavior just as objectionable a showing of bad faith, as *Goodwin v. Old Republic Ins. Co.*, 828 P.2d 431, 432 n. 1 (Okla.1992) teaches).

*Time Allowed for Closing Argument*

■ Thompsons claim reversible error in the district judge's limitation of each side's closing argument to 20 minutes. Whether because such restrictions are infrequently imposed or because lawyers recognize the discretionary nature of such rulings or for some other reason, few reported decisions deal with the question. We last had occasion to pass on it nearly three decades ago, when we said in *Carlin v. Stringer*, 365 F.2d 597, 599 (10th Cir.1966):

> Supervision of oral argument is part of the procedural conduct of the trial and is primarily entrusted to the discretion of the trial court.[5]

Decisions affecting the time allocated for closing argument will be reversed only for an abuse of that discretion (*id.*), which means that Thompsons must show that they were prejudiced by the trial court's ruling (*Franklin v. Shelton*, 250 F.2d 92, 99 (10th Cir. 1957)).

In an effort to make that showing Thompsons cite this note that the jury sent out during its deliberations:

Could someone explain concealment of fraud, according to the policy, Section 1 and 2 conditions?

Thompsons contend that note reflects confusion on "the central issue in the case," a confusion that could have been avoided had they been allowed more time for closing argument. As for the reason that 20 minutes was assertedly insufficient, Thompsons simply refer to the length of the trial (four days) and to the number of witnesses and exhibits presented. None of that, either singly or collectively, amounts to a showing of prejudice.

If the jury's question reflected a need for exposition as to the law, which is how it sounds, that does not bear on closing argument in any event. After all, it was not the role of Thompsons' lawyers to instruct the jury on the law, "for it is axiomatic that the judge is the sole arbiter of the law and its applicability" (*Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir.1988) (en banc)). If on the other hand the question reflected confusion as to the relevant facts and as to whether or not they satisfied the legal standard (although that seems a less plausible reading of the question), it would be a proper subject for oral argument. But Thompsons do not show (as they must) what their lawyer would have done differently if he had more time. They point to nothing, to no particular piece of evidence or testimony, as to which more time would arguably have enabled their counsel to alleviate the jury's confusion and to obtain a favorable verdict.

Thus Thompsons have failed to show any prejudice from the curtailment of closing argument. Absent such a showing, it must be concluded that the district judge did not abuse her discretion in imposing the time limitation.

*Jury's Answers to Interrogatories*

■ We turn finally to Thompsons' last argument for reversal: the alleged inconsis-

---

5. Although cases from our sister circuits are similarly scant in number, they apply the same standard: *Bonilla v. Yamaha Motors Corp.*, 955 F.2d 150, 155 (1st Cir.1992); *United States v. Hand-finger*, 364 F.2d 800, 802 (3d Cir.1966); *Murphy v. National R.R. Passenger Corp.*, 547 F.2d 816, 818 (4th Cir.1977); *Jeter v. St. Regis Paper Co.*, 507 F.2d 973, 980 (5th Cir.1975).

tency of the jury verdict.[6] Thompsons point to the jury's findings (1) that Thompsons did not violate the Intentional Acts provision of the Policy (that is, they did not set the fire themselves or cause it to be set) but (2) that they did violate the Concealment or Fraud provision (that is, they lied about the imminent sale of their Tah–Mels business or of the Honduran stock or both).[7] Thompsons urge that if they did not set the fire they had no reason not to be entirely truthful in the information that they gave State Farm, so that the jury's finding that they violated the Concealment or Fraud provision can only be described as illogical. State Farm counters that Thompsons waived that argument by failing to present it before the dismissal of the jury.

*RTC v. Stone,* 998 F.2d 1534, 1545 (10th Cir.1993) teaches that the application of that doctrine of waiver depends on the type of jury verdict at issue:

> A failure to object to general jury verdicts on the ground of inconsistency before the jury is discharged constitutes waiver, unless the verdict is inconsistent on its face such that entry of judgment upon the verdict is plain error. *Hinds v. General Motors Corp.,* 988 F.2d 1039, 1047 (10th Cir. 1993). However, when the verdicts are special verdicts a party is not required to object to the inconsistency before the jury is discharged in order to preserve that issue for a subsequent motion before the district court. *Bonin v. Tour West, Inc.,* 896 F.2d 1260, 1263 (10th Cir.1990) [ (per curiam) ].

And Rules 49(a) and (b) define the alternative types (we quote only the opening sentence of each—all that is needed for the present analysis):

> **(a) Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.
> **(b) General Verdict Accompanied by Answer to Interrogatories.** The court

may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict.

In this instance Part 1 of the Verdict Form reproduced in the Appendix is plainly a general verdict (see, e.g., *Stone,* 998 F.2d at 1547), while Part 4 just as plainly sets out accompanying interrogatories. No objection on purported grounds of inconsistency was lodged by Thompsons' counsel at any time before the jury was discharged—instead it was fully a week later, as part of Thompsons' written post-trial motion, that the contention was advanced for the first time. Thompsons' current argument that waiver is somehow averted by their counsel's one-sentence oral motion for judgment notwithstanding the verdict, a motion made before the jury was discharged but that did not even hint at any inconsistency argument, is simply untenable.

■ That leaves only the question whether "the verdict is inconsistent on its face such that entry of judgment on the verdict is plain error" (*Stone,* 998 F.2d at 1545). To ask that question is really to answer it. Whatever Thompsons' motives may have been—whether to conceal their burning of their own property or otherwise—the jury was entitled to find entirely compelling the evidence that Thompsons gave materially false and misleading answers to State Farm's investigator Sands. And it does not matter that the jury simultaneously found that State Farm had not also proved the most common motive for such conduct—arson by the insured. It must be remembered that the Policy's provisions dealing with Intentional Acts and with Concealment or Fraud are independent grounds for denial of coverage, either one sufficing to defeat the insured's claim.

It is undisputed that the district judge properly instructed the jury that it was State Farm's burden to prove its affirmative defenses, based on those two provisions, by a

---

**6.** We reproduce the verdict form as the Appendix to this opinion.

**7.** Again, lacking the Policy in the record we do not have its precise provisions. But given the argument of counsel before the district judge

concerning the jury instructions and the portion of those instructions contained in the record, those are the clear meanings of the two jury responses.

preponderance of the evidence. We do not eavesdrop on juries, so that we have no way of knowing why the jury found that burden had not been met on the more serious charge of Intentional Acts, with its overtones of criminality—perhaps it may have done so because of those very overtones (see the Supreme Court's discussion of the concept of jury lenity in the criminal law context in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)). What controls here is that a rational jury could readily have done just what this jury did. Because there is surely no plain error in that, Thompsons have failed to prevail here, and that is the end of our analysis (*Stone,* 998 F.2d at 1547).

### Conclusion

We have addressed all of Thompsons' arguments attacking the conduct and outcome of their jury trial below, and we have found all of them to be without merit. We AFFIRM.

### APPENDIX

### VERDICT FORM

We the jury, duly empaneled and sworn in the above-entitled cause, do, upon our oaths, find:

### PART 1

Do you find that the plaintiffs, E.G. and Betty Thompson, should recover on their contract claim against the defendant, State Farm Fire & Casualty Company?

YES _____ NO ___✓___

(if the answer is yes, proceed to Parts 2 and 3)
(if the answer is no, proceed to Part 4)

(COMPLETE PART 2 AND 3 ONLY IF YOU ANSWERED "YES" IN PART 1)

### PART 2

WE, the jury, being duly sworn upon our oaths, find the damages to the plaintiffs to be:

For the structure: $_____
(not to exceed the policy limit for liability on the structure: $40,000)

For the contents: $_____
(not to exceed the policy limit for liability on the contents: $10,000)

For lost rents: $_____
(not to exceed $4200 which is $350 per month for twelve months beginning on June 6, 1991, the date of the fire)

### PART 3

Do you find that plaintiffs have proven their claim of bad faith?

YES _____

and set the amount of plaintiffs' damages at $_____
(do not include the damages awarded in Part 2)

-or-

NO _____

946

PART 4

Do you find that plaintiffs violated the "Intentional Acts" provision of their insurance policy?

YES _____ NO ___✓___

Do you find that plaintiffs violated the "Concealment or Fraud" provision of their insurance policy?

YES ___✓___ NO _____

3/4/93 _____ /s/ Bruce Lee Smith _____

Date Foreman