815 A.2d 910

**Robin Vania HODGE,**

v.

**Michael Allen BABEL.**

**No. 1930, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Jan. 30, 2003.

378

Scott A. Bowling (Chapman, Bowling & Scott, P.A., on the brief), La Plata, for appellant.

Jonathan R. Clark (Amy Leete Leone and McCarthy & Wilson, on the brief), Rockville, for appellee.

SALMON, SONNER and KRAUSER, JJ.

SALMON, Judge.

This appeal has its provenance in a January 21, 1999, automobile accident, which occurred in Gambrills, Anne Arundel County, Maryland, about 5:40 p.m. On that date, an automobile, driven by Michael Babel ("Babel"), pulled in front of a car driven by Robin Hodge, aged twenty-two, causing the two cars to collide.

Ms. Hodge suffered a cut to her forehead and other injuries as a result of the accident. She was released that evening from North Arundel Hospital in Pasadena, Maryland.

Ms. Hodge brought a negligence action in the Circuit Court for Anne Arundel County against Babel. Prior to trial, Babel conceded that his negligence caused the subject accident.

The damage phase of this tort action was heard by a jury in a trial that commenced on October 11, 2001 (Honorable James Cawood, presiding). The sole issue for the jury to resolve was:

What damages would fairly compensate Ms. Hodge for the injuries that she sustained in the January 21, 1999, accident?

During the trial, Babel's attorney called him as a witness. Counsel asked on direct examination, without objection, whether he was presently employed. Babel answered in the negative. Counsel then asked Babel why he was unemployed. Ms. Hodge's counsel objected to that question, but the objection was overruled by Judge Cawood. Babel then testified

that he suffered from "progressive Multiple Sclerosis" ("M.S."). Several others questions followed, and the answers to those questions established that Babel was in good health before the accident; M.S. was diagnosed several months post accident.

After Babel had concluded his testimony, counsel for Ms. Hodge asked that the testimony concerning the reason that Babel was unemployed be stricken. That motion was denied.

The jury returned a verdict in favor of Ms. Hodge and against Babel in the amount of $2,600. This verdict was broken down as follows: $860 for lost wages; $740 for medical expenses, and $1,000 for non-economic damages. The verdict was disappointing to Ms. Hodge because she introduced evidence, which, if believed, showed that she had incurred medical bills as a result of the accident totaling $13,453 and had incurred lost wages in the amount of $1,714.44. Counsel for Ms. Hodge filed a motion for new trial. The motion was denied without a hearing.

On appeal, the sole issue presented is whether Judge Cawood committed reversible error in allowing Babel to tell the jury that the reason he was unemployed was because he suffered from M.S.[1]

## I. *EVIDENCE CONCERNING MS. HODGE'S MEDICAL CONDITION POST-ACCIDENT*

The main injuries claimed to have been suffered by Ms. Hodge as a result of the January 21, 1999, accident, were to

---

1. In her brief, appellant lists three issues to be decided. They are:
 I. Whether evidence that the appellee is unemployed because he suffers from primary progressive multiple sclerosis is irrelevant and inadmissible evidence.
 II. Whether the evidence that the appellee is unemployed because he suffers from primary progressive multiple sclerosis is unfairly prejudicial, confused the issues before the jury and was erroneously admitted by the trial court.
 III. Whether the unfair prejudice caused by the appellee's testimony could be cured by the instructions offered by the trial court.
 As can be been, those three issues can be condensed into the single question that we have set forth above.

her neck, shoulder, and back. These injuries were soft tissue in nature. As is common when soft-tissue injuries are claimed, the main question to be decided is whether the jury believes the plaintiff and her experts or whether it believes the testimony of the expert retained by the defense.

Ms. Hodge called one live expert witness, Dr. Joseph Chin, and produced another, Dr. Chester DiLallo, who testified by way of videotape. Babel called Dr. Robert Smith as his sole expert witness.

After Ms. Hodge was released from the emergency room on January 21, she missed two days from work immediately thereafter. She saw no health care providers until February 8, 1999, when she visited her family physician, Dr. Imelda Miranda. Ms. Hodge complained to Dr. Miranda of chest pains and discomfort in her back. Dr. Miranda ordered x-rays, but according to Ms. Hodge, gave her no "additional counsel ... as to how to fix" her medical problems. At that point, Ms. Hodge's total medical bills were approximately $800.

On the recommendation of a friend and because "her neck and back were hurting," Ms. Hodge visited the office of Dr. Chester DiLallo, an orthopaedic surgeon. Over a period of approximately two months, starting February 10, 1999, she went to Dr. DiLallo's office for a series of physical exams and physical therapy. Total charges from Dr. DiLallo for those services were approximately $4,000.

Dr. DiLallo testified that when he first examined Ms. Hodge on February 10, 1999, she complained of having discomfort to the back of her neck. She also had discomfort in the lower portion of her neck when she flexed her head forward or rotated her head to the right. Dr. DiLallo concluded, after obtaining x-rays, that Ms. Hodge had sustained a contusion on her forehead with lacerations that were being treated, contusions of her chest and neck, and a scapular muscle strain. He recommended that she use an anti-inflammatory medication and suggested that she undertake physical therapy on a two-

times-per-week basis, plus a home program for regaining mobilization.

When Ms. Hodge completed her initial series of treatments on April 5, 1999, she had tenderness in her neck and the mid-back area of her spine, but she had regained full motion in her neck, and she had no neurological problems. Dr. DiLallo recommended that she appear for a follow-up visit with him in about one month. He gave her some low-back exercises to do at home, together with advice as to a general exercise program that he thought could help her.

Ms. Hodge contacted Dr. DiLallo once again in September 1999 to discuss her problem of persistent discomfort in her back, which was made worse by weather and certain activities. She was otherwise unchanged from her April 1999 visit. Dr. DiLallo told Ms. Hodge that, if her pain persisted, she could receive injections.

About six months later, in March 2000, Ms. Hodge, once again, was seen by Dr. DiLallo. This time she told him that she had gone through a period of several weeks where she had persistent pain in her back, which was frequent enough to be of concern. His examination showed that she had "a bit of reversal of the dorsal kyfosis" in the mid-back area, which was also the area where she was experiencing discomfort. According to Dr. DiLallo, this meant "that the back, which normally curves like a cat in one direction, was curved in the opposite direction." In Ms. Hodge's case, there was a reversal of the normal curve or a flattening. He believed that the flattening that he saw was caused by spasms and "basically provided some credence" to her complaints. Dr. DiLallo's diagnosis, at that point, was that Ms. Hodge had a sprain of her interspinaus ligaments in the lower mid-back, which meant that the "fibers of ligaments in the lower dorsal area" had stretched. He also thought that she had also strained some ligaments between her ribs and backbone." He testified that this type of injury was uncommon and that, in his thirty-plus years in private practice, he had only seen seven patients "with this particular symptom complex." Ms. Hodge was again offered

injections to treat her symptoms, but she rejected the offer because it would bring only temporary relief.

Thirteen months after last seeing Dr. DiLallo and approximately six months before trial was set to commence, Ms. Hodge went to see Dr. Joseph Chin, a physician whose specialty is "occupational and physical medicine." Dr. Chin, in conjunction with a chiropractor, operates a business known as "Total Wellness and Physical Medicine of Bowie" ("Total Wellness Center"). Starting on April 26, 2001, and continuing up until about a week before trial, Dr. Chin, and/or his agents, gave Ms. Hodge numerous hot and cold packs, "unattended electrical stimulation," "manual therapy," ultrasound, and other treatments for her spine. Treatment from the Total Wellness Center cost a total of $7,984.

At the Total Wellness Center, Ms. Hodge was initially seen by a chiropractor (Dr. Kappes), but in June of 2001, she saw Dr. Chin, personally. At that time, she complained of pain in the mid- and low-back area. Dr. Chin found no spasms (tightness) in the middle of the back but did find spasms in the low-back area. Dr. Chin thought that Ms. Hodge had a permanent injury due to the subject accident. He opined that she had benefitted from the therapies she had received at the Total Wellness Center, that the range of motion was better, and that her back was better conditioned. Nevertheless, according to Dr. Chin, Ms. Hodge's symptomatology had remained constant and there were indications of changes in her musculature.

At the request of defendant's attorney, Ms. Hodge was examined by Dr. Robert Smith, an orthopaedic surgeon. Dr. Smith examined Ms. Hodge on April 17, 2001—about the same time that she started to receive treatment at the Total Wellness Center. His orthopaedic and neurological examinations of Ms. Hodge were normal. She did not complain of tenderness in any part of her spine, and he found no objective signs of injury.

Dr. Smith testified that in reviewing the medical reports concerning Ms. Hodge's post-accident treatment, he found (1)

that on the day of the accident her back and neck were normal and that no x-rays of those areas were ordered; (2) that when Ms. Hodge visited Dr. Miranda on February 8, 1999, she had no objective symptoms concerning her spine; (3) when Ms. Hodge saw Dr. DiLallo for the first time on February 10, 1999, there were "no objective findings" concerning her neck, shoulder [or] back region, nor did Dr. DiLallo note any subjective complaints regarding the patient's low-back area; and (4) at the time Ms. Hodge first saw Dr. DiLallo, her complaints were in regard to her "shoulder blades" and "mid-back" area.

Dr. Smith's opinion regarding Dr. DiLallo's treatment was developed during the following exchange with defense counsel:

Q All right. Based upon his examination, do you have an opinion as to whether or not the treatment [Dr. DiLallo] rendered to the plaintiff was medically necessary?

A Again, I have an opinion.

Q All right. And what is that opinion with respect to the treatment that Dr. DiLallo rendered?

A Well, in my opinion based upon purely objective findings, the treatment was not necessary because there were no objective findings that would warrant any form of treatment.

Q And let me ask you, and—in that situation had you been the provider, what other alternatives would have been appropriate in your opinion?

A Well, there are other alternatives. I'm sure this is also a pretty common experience for many people. You can treat these things at home with either an ice pack, cold pack, or a hot pack. You may have to see the doctor. He may give you medication and teach you how to do some simple stretching things.

Dr. Smith opined that the treatment Ms. Hodge received from the Total Wellness Center was not occasioned by the subject accident. He explained this opinion as follows:

[T]emporally or time-wise it is so far removed from the accident that in my opinion it would be within a reasonable

degree of medical probability unrelated to the accident in question.

And also it would be extremely unlikely given the fact that in the immediate period following the accident all through 1999 there were never any objective findings noted by any physician of an ongoing injury related to this accident. So for those two reasons I believe the subsequent treatment she received in 2001 is not related to this accident.

## II. *RULINGS BY JUDGE CAWOOD AND HIS INSTRUCTIONS*

Testimony concerning the fact that Babel suffers from M.S. came about in the following series of questions that were put to him by his counsel.

Q MR. CLARK [COUNSEL FOR DEFENDANT:] At the time of this accident back on January 21 of 1999, were you employed?

A [DEFENDANT:] Yes. I was.

Q Okay. And for whom were you employed at that time?

A Taylor Printing Company in Hyattsville, Maryland.

Q How long had you been employed for that printing company, roughly?

A Over 19 years.

Q Are you currently employed?

A No. I'm not.

Q And why not?

MR. BOWLING [COUNSEL FOR PLAINTIFF]: Objection.

\* \* \*

THE COURT: I will allow it just briefly. You may answer. Go ahead.

THE WITNESS: I have primary progressive multiple sclerosis.

\* \* \*

Q And at the time of this accident you have a license—did you have a driver's license?

A Yes. I did.

Q Were you authorized and legally allowed to drive?

A Yes.

Q Did the diagnosis of your condition happen after this accident?

A After the accident.

Q And is it unrelated to the accident?

A Unrelated.

After some additional testimony, the jury was excused. The following discussion was then held at the bench:

MR. BOWLING: Your Honor, I would like to once again renew my motion and move to strike any testimony pertaining to Mr. Babel's medical condition. I thought that we were going to eliminate his medical condition.

The question of why he doesn't work for an employer has absolutely no relevance to this case other than to otherwise disorient the jury on Ms. Hodge's medical condition.

MR. CLARK: I am not sure I see it that way. I certainly didn't when I asked the questions. I simply was trying to explain to the jury and trying to take away from inference that they might have that he was somehow disabled at the time of the accident which caused the accident, and that was the reason for explaining to them that the condition as now did exist at the time, and that was the reason for it.

THE COURT: I don't frankly think that the mere fact that he has MS—*they obviously wonder what this situation is,* it isn't concerning the accident. We can cover anything I

think with an instruction. I don't see a reason to strike it. I think it would . . . .

(Emphasis added.)

Judge Cawood instructed the jury in accordance with Maryland Pattern Jury Instruction 1:15, which reads:

### IMPARTIALITY IN CONSIDERATION

You must consider and decide this case fairly and impartially. All persons, including corporations, stand equal before the law and are entitled to the same treatment under the law. You should not be prejudiced for or against a person because of that person's race, color, religion, political or social views, wealth or poverty. You should not even consider such matters. *The same is true as to prejudice, for or against, and sympathy for any party.*

(Emphasis added.)

The jurors submitted a note to Judge Cawood during their deliberation, asking:

1. Did Mr. Babel have insurance to cover any of [Ms. Hodge's] expenses?

2. [If so,] is the [reference to] PIP shown in Exhibit 3, Section 3, her [PIP] insurance or his?

Judge Cawood answered the question as follows:

[Insurance] doesn't matter. . . . [U]nder what we call the law of the collateral source rule, just don't take into consideration whether any monies are paid any insurance, any sick leave or anything else.

\* \* \*

. . . All you have to do is find what the reasonable amounts are and calculate that into your damages. . . . [D]on't worry whether any [sic] was or wasn't covered by insurance or whose PIP it was.

Just calculate what you feel is the fair and reasonable loss of wages and the fair and reasonable expenses.

Neither counsel objected to the court's answer to the jury note or requested that any additional instruction be given.

## III. *ANALYSIS*

An analysis of the jury verdict reveals that the jury credited the testimony of Dr. Smith and disregarded the contrary opinions of Dr. DiLallo and Dr. Chin in regard to Ms. Hodge's special damages. Evidently the jury thought that Ms. Hodge was entitled to reimbursement for lost wages occasioned by her absence from work immediately after the accident and for the payment of medical expenses up through her treatment, on February 8, 1999, by Dr. Miranda. The jury declined to award damages that would reimburse her for medical bills incurred subsequent to February 8, 1999.

Appellant argues that the trial court erred when it allowed defense counsel to ask Babel why he was unemployed. She further argues that Judge Cawood's "error" resulted in an inadequate award of damages and was so prejudicial as to warrant a new trial.

Before directly addressing this issue, it is useful to point out that, even without Babel's testimony concerning his M.S., it was evidently obvious to both the trial court and the jury that Babel was suffering from some serious ailment. Appellant's counsel concedes as much when he says in his brief that "[t]here was some suggestion in the record that Mr. Babel walked with a cane and was unsteady." Appellee's counsel, in his brief, agrees and adds that "at trial ... [Babel] had difficulty rising from his chair at counsel table." Moreover, Judge Cawood, when he denied the motion to strike a portion of Babel's testimony, said that the jurors "obviously wonder what his [Babel's] situation is...."

Appellant stresses that the sole issue to be decided by the jury was what amount of money would adequately compensate Ms. Hodge for her injuries. Therefore, according to appellant, whether Babel had M.S. simply had no bearing on the issue to be decided and therefore should have been excluded.

Appellant relies on Maryland Rules 5–401 and 5–402. These rules provide:

**Rule 5–401. Definition of "relevant evidence".**

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Rule 5–402. Relevant evidence generally admissible; irrelevant evidence inadmissible.**

Except as otherwise provided by constitutions, statutes, or these rules, by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible.

Babel contends that "decisional" law in Maryland supports the admission of evidence that, while not technically "relevant," is nevertheless admissible as background evidence. Appellee relies upon *Fraidin v. Weitzman*, 93 Md.App. 168, 195, 611 A.2d 1046 (1992), in which we said:

The admission of background evidence is a generally accepted exception to the relevancy requirement. *See* 1 Strong, *McCormick on Evidence* § 185 at 774 (4th ed. 1992) ("[C]onsiderable leeway is allowed even on direct examination for proof of facts that do not bear directly on the purely legal issues, but merely fill in the background of the narrative[.]").

Appellee also points out that in the *Fraidin* case, this Court noted [that] the advisory committee note to Rule 401 of the Federal Rules of Evidence (from which the Maryland Rule is derived) states that, "[e]vidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding." *Fraidin*, 93 Md.App. at 195, 611 A.2d 1046 (quoting Advisory Committee Note to Fed.R.Evid. 401).

(Footnote omitted.)

It has long been the rule in Maryland that "the reception of evidence is to a large degree entrusted to the discretion of the

trial court and its action will seldom constitute grounds for reversal." *Attorney Grievance Comm'n v. Kerpelman*, 288 Md. 341, 359, 420 A.2d 940 (1980). *See also Thrifty Diversified, Inc. v. Searles*, 48 Md.App. 605, 615, 429 A.2d 270 (1981).

The subject case presents a good example as to why trial judges are given wide discretion in matters relating to the admission or exclusion of evidence. A trial judge can see and hear things that an appellate review panel, reading the cold record, has no way of either balancing or appreciating. For example, it appears to be undisputed that at trial Babel walked with an unsteady gait and even had trouble rising from the counsel table. But, from the record, we cannot tell exactly how he looked or how the jury reacted. Nevertheless, based upon what counsel have conceded in their briefs and in oral argument, we can say that Babel's physical condition would undoubtedly invoke curiosity on the part of the jurors who would want to know why he walked and acted as he did. In our view, it is not an abuse of discretion for the trial judge to allow the witness, as factual background, to give a brief explanation as to the cause of his physical problem—especially in a case like this where, if no explanation were given, the jury might have thought that the disability may have caused Ms. Hodge's injury.

Appellant nevertheless contends that the question asked of Babel about his physical problems was unfairly prejudicial and, for that reason, he should not have been allowed to give an explanation. This argument appears to be appellate afterthought. No such claim was made at trial when appellant's counsel set forth his reasons why he believed that the testimony should be stricken. It will be recalled that at that point appellant's counsel's only ground for striking the testimony was that (1) the information was irrelevant and (2) it would "otherwise disorient" the jury. Obviously, an argument that a jury would be disoriented by testimony is not the same as arguing that a jury would be unfairly prejudiced by it.

In any event, even assuming, *arguendo*, that trial counsel made the court aware at trial that he thought that the

question regarding M.S. should be stricken because it might invoke undue sympathy, none of appellant's present arguments are convincing.

Appellant argues:

[T]he [a]ppellee's testimony was unfairly prejudicial because it revealed that he is unemployed, which is irrelevant to the quantum of damages the [a]ppellant proved. Attempting to create sympathy for a defendant by suggesting that the defendant will be seriously harmed from the financial consequences of a judgment is unfairly prejudicial and evidence relating thereto is inadmissible. *See, Joseph v. Brierton,* 739 F.2d 1244 (7th Cir.1984) (trial court should have granted a mistrial when defendants' attorney stated to jury that adverse judgment would ruin defendants); *Rebolledo v. Herr–Voss Corp.,* 101 F.Supp.2d 1034 (N.D.Ill.2000) (evidence explicitly indicating that judgment would cause financial harm or burden to defendant was irrelevant and inadmissible under Rule 403 as unfairly prejudicial). Under Maryland law, evidence of a defendant's financial condition is relevant only when the plaintiff is seeking punitive damages, and then only after there has been a finding of liability and that punitive damages are supportable under the facts. *Cole v. Sullivan,* 110 Md.App. 79, 676 A.2d 85 (1996).

Portions of the foregoing argument overlook the fact that, before any question was asked as to why he was unemployed, Babel told the jury, without objection, that he was unemployed. Thus, standing alone, testimony that appellee was unemployed was not prejudicial. *See S & S Building Corp. v. Fidelity Storage Corp.,* 270 Md. 184, 190, 310 A.2d 778 (1973) (error is not prejudicial if a witness, over objection, testifies to a fact that earlier came into evidence without objection); *Robeson v. State,* 285 Md. 498, 507, 403 A.2d 1221 (1979) (same). *See also Forrester v. State,* 224 Md. 337, 343–44, 167 A.2d 878 (1961).

Appellant makes a related argument by claiming that the admission of testimony that appellant was afflicted with M.S. was unfairly prejudicial because "it created a high risk of

sympathy for that party." Admittedly, there was a risk that the jury would feel sympathy for Babel. Any right-thinking person would be sympathetic to his plight. But in this case, because Babel's physical ailment was evident for all to see, there was a high likelihood that the jury would feel sorry for him anyway. As Judge Cawood said, "Striking the testimony that appellant had M.S. would [most likely] only serve to emphasize it," and the matter would be "cover[ed] by" jury instructions.

■ In his instructions, Judge Cawood told the jurors, in plain, easily understood language, that they should not even consider "sympathy for any party." Jurors are presumed to have understood and to have followed the court's instruction, and "[o]ur legal system necessarily proceeds upon" that presumption. *State v. Moulden,* 292 Md. 666, 678, 441 A.2d 699 (1982); *Whittington v. State,* 147 Md.App. 496, 535, 809 A.2d 721 (2002). That presumption was not rebutted in this case.

In support of her argument that Judge Cawood's decision to allow the jury to hear that Babel suffered from M.S. constituted reversible error, appellant cites several cases from outside this jurisdiction. We find none of those cases to be persuasive. *Thompson v. State Farm Fire & Casualty Co.,* 34 F.3d 932 (10th Cir.1994), is cited for the proposition that "evidence regarding the condition of a party unrelated to the events in a law suit is unfairly prejudicial because it creates a high risk of sympathy for that party." No such broad proposition was announced in *Thompson.* In that case, unlike the present one, the issue presented was whether the trial judge erred when he disallowed testimony that one of the parties suffered from epilepsy. Unlike the present case, the condition was not open and obvious. The *Thompson* Court's decision simply stands for the unremarkable proposition that the trial court did not abuse his discretion in disallowing such testimony. *Id.* at 940.

Appellant also cites the case of *Cole v. Bertsch Vending Co.,* 766 F.2d 327 (7th Cir.1985), in which the court concluded that the plaintiff was entitled to a new trial when the defendant's counsel improperly appealed to the sympathy of the jury

during closing argument. In the *Cole* case, defense counsel suggested that the jury should feel sympathetic toward the defendant because he had suffered a heart attack during trial. The Seventh Circuit found that jury appeals of this sort were so prejudicial as to require a new trial. *Id.* at 135, 676 A.2d 85. Unlike *Cole,* the defense counsel in the subject case never once appealed for sympathy for his client. Instead, he told the jury in his closing argument:

> On [Babel's] behalf[,] I ask you to do the following. Take the instructions that His Honor has given you. Collectively decide those facts that you believe make sense, and then render a just and fair verdict that compensates this [p]laintiff for those things the evidence has shown Mr. Babel is responsible for, and no more. Thank you.

Appellant cites *El–Meswari v. Washington Gas Light Co.,* 785 F.2d 483 (4th Cir.1986), for the proposition that "physical condition is inadmissible because [it is] unfairly prejudicial." The *El–Meswari* case concerns the attempt of a mother, who had brought a wrongful death claim as a result of the death of her five-year-old son, to recover for her heart problems and other physical problems, which she allegedly suffered as a result of her son's death. *Id.* at 487–88. The court held that, although such injuries did have potential relevance concerning the issue of the magnitude of plaintiff's emotional injuries, it also had the potential for being prejudicial because, under Virginia law, compensation for physical injuries caused by a wrongful death was not allowed. *Id.* at 488. Therefore, the *El–Meswari* Court held that the trial judge did not abuse his discretion in disallowing plaintiff's proffered testimony. *Id.* As can be seen, the *El–Meswari* case is completely inapposite.

Appellant suggests, but does not say explicitly, that the jury note shows that the prejudicial effect of the M.S. testimony was not overcome by the court's instruction to the jury not to base their decision upon sympathy for any party. We can see no link between the note from the jury and the testimony that Babel has M.S. A number of the medical bills introduced by appellant's counsel made reference to the fact that the bills were paid by an insurer (referred to as "B/C B/S") and by

"PIP." These references to insurance payments should have been, but were not, redacted by appellant's counsel prior to introducing the exhibits into evidence. Common sense teaches that when references to insurance are made in exhibits that are presented to the jury for scrutiny, the curiosity of the jurors will inevitably be aroused. And, as a practical matter, almost all jurors are likely to be drivers of automobiles and most, if not all, know that liability insurance is mandatory. This being so, there is a great likelihood that the questions raised by the jurors came about due to what they read in the exhibits introduced by appellant and not because the defendant said he has M.S.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**